*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NOS. 2013-036 & 2013-037

JUNE TERM, 2013

| | | |
|---|---|---|
| In re T.A.Z., A.M., B.M. and J.M., Juveniles | } | APPEALED FROM: |
| | } | |
| | } | Superior Court, Franklin Unit, |
| | } | Family Division |
| | } | |
| | } | DOCKET NOS. 115/116/117/118-9-11 |
| | | |
| | | Trial Judge: Martin A. Maley |
| | | |
| In re B.M. and J.M., Juveniles | } | |
| | } | |
| | } | DOCKET NOS. 117/118-9-11 Frjv |

In the above-entitled causes, the Clerk will enter:

Mother and father each appeal the termination of their residual parental rights with respect to their children, B.M. and J.M. We affirm.

Four children were the subject of the instant termination proceeding. The elder two, who were born in 1996 and 1998, have different fathers. Neither of those fathers has appealed the termination of his parental rights. Mother and father challenge the termination order with respect to only the younger two children—B.M., who was born in September 2001, and J.M., who was born in September 2002.

The Department for Children and Families (DCF) has been involved with the family since 2003 when mother and father moved here from Florida with the children to avoid having the Florida child protective services agency remove the children from their care for a second time. The concerns of the Florida agency were similar to those later addressed by DCF—unsanitary and unsafe conditions in the home, poor personal hygiene, and lack of supervision of the children. After the family arrived in Vermont, DCF began receiving reports of physical abuse of the children by father, unsanitary conditions in their home, and the failure of the parents to address the children's medical and educational needs. Beginning in 2008, a home-school coordinator was involved with the children, who were appearing at school smelling like cat urine and dressed in filthy, ill-fitting clothes. All the children were obese, without necessary eyewear, and had untreated dental and behavioral problems. They all had conditions that required medications. Both mother and father were resistant to cooperating with DCF and making changes.

In March 2010, DCF opened a case involving the family after a visit revealed an unsanitary home infested with fleas and reeking of cat urine and cigarette smoke. In September 2011, DCF filed a petition alleging that the children were in need of care and supervision (CHINS) after learning of an altercation during which father choked the eldest child. The

conditions at the home were still unsanitary, with cat urine and feces covering the floor. All of the children had behavioral problems and were doing poorly in school. They also had significant dental problems and were taking various medications. DCF placed the children in the home of their maternal aunt. In November 2011, the children were adjudicated CHINS based on mother's and father's stipulation that the condition of their home was unsanitary, the children's medical, dental, and hygienic needs were not being met, and they had failed to follow through with services and make appropriate changes to address the condition of the home and the needs of the children.

DCF's disposition case plan, which recommended concurrent goals of reunification and termination of parental rights, was approved in January 2012. The plan provided that the parents: (1) maintain a safe, stable, and sanitary home; (2) engage in services to help them manage their emotions and resolve differences without resort to violence; (3) protect the children from abuse and risk of harm; (4) be accountable and accept responsibility for their actions without blaming others; (5) demonstrate an understanding of how their actions impact the children; (6) show respect for their children's caregivers and focus on the children's needs; and (7) recognize the needs of the children and demonstrate through their actions that they understand those needs. The plan also called for father to identify coping strategies developed through therapy and parenting groups to deal with his anger issues so that he no longer screamed at his children or other people.

In December 2011, eviction proceedings were commenced against mother and father. They refused to vacate the premises but were forcibly evicted in March 2012. At the time they were evicted, the house was in deplorable condition, with the landlord having to remove forty pounds of cat waste and several truck loads of garbage. Mother and father had no stable housing until August 2012, when they moved into an apartment.

That same month, DCF filed its motion to terminate parental rights. A termination hearing was held over two days in November 2012. On December 21, 2012, the family division of the superior court issued its decision terminating parental rights with respect to all four children. The court determined that there was a substantial change in material circumstances insofar as neither mother nor father had demonstrated significant progress toward being able to care for their children. The court further determined that termination of parental rights was in the children's best interests because of the strained relationship between the parents and children, the children's marked improvement since they were removed from their parents' care, and the unlikelihood of either mother or father being able to resume their parental duties within a reasonable period of time.

On appeal, mother argues that the evidence does not support the court's assessment of the two younger children's relationship with her. She contends that the court should have analyzed separately each child's relationship with each parent rather than make an imprecise, inaccurate, and unsupported finding that the younger children's relationship with their parents was "strained." **PC 10** According to mother, her relationship with the younger children cannot be equated with her relationship with her eldest child, who wants to cut ties with her, and yet the court also used the word "strained" to describe the latter relationship. Mother asserts that the court trivializes the word by using it to describe both relationships, when the evidence showed

that B.M wanted mother to express more love for him and that J.M. wanted to go home as long as the home would be kept clean.[*]

Upon review of the record, we conclude that the evidence supports the court's finding that the younger children's relationship with their parents, including mother, was strained. The evidence demonstrated that the children lived for many years in an unsanitary home in which neither mother nor father satisfactorily addressed the children's most basic hygienic, dental, and medical needs. After the children were removed from the home, the focus of the parent-child relationship was on their emotional rather than physical needs. The evidence revealed that neither mother nor father sent the children cards or letters or followed through on DCF's offer to have community visits with the children. The evidence further revealed that B.M. desired more affection from mother, but she was unable to demonstrate affection to him even though service providers coached her how to do so. Moreover, B.M continued to express fear of father and did not believe that mother could protect him from father. After visits with mother, he would act out or cry for hours at a time. J.M expressed a desire to return home, but only if his parents could provide a clean and stable home environment. All of this evidence supports the court's finding that the younger children had a strained relationship with their parents, including mother. See In re A.F., 160 Vt. 175, 178 (1993) (stating that findings "will stand unless clearly erroneous" and "our role is limited to determining whether they are supported by credible evidence"). As for the court using the word "strained" to describe mother's relationship with both her eldest child and the younger children, the fact that her relationship with the eldest child was particularly bad does not suggest that her relationship with the younger children was not strained.

For his part, father argues that the court erred in terminating his parental rights because he did all that DCF asked him to do—including participating in counseling and parenting classes, attending all scheduled visits, and maintaining a clean and stable home environment—and he had made substantial progress toward being able to care for his children. Our review of the record does not support father's assertions. Without question, father followed most if not all of the directives in the case plan. Unfortunately, however, the evidence supports the court's determination that his efforts failed to translate into the personal growth necessary for him to be able to provide his children with a safe, stable, and nurturing home within a reasonable period of time as measured from the perspective of the children. See In re B.M., 165 Vt. 331, 337 (1996) (stating that reasonable period of time is measured from perspective of children). Although father attended all of the scheduled visits with the younger children, the service provider testified that she continued to work with the parents on the same issues surrounding visits—avoiding adult conversations, controlling anger, providing structure to the visits, and having healthy snacks. Father complains about the environs of the visits and yet, when DCF expressed a willingness to consider the option of community visits, neither he nor mother followed through on that option. Nor did father maintain consistent communication with either the foster parents or the children's teachers and doctors to keep track of the children's needs and progress.

Father also participated in therapy and parenting classes, but the evidence demonstrated that he still had not fully accepted responsibility for his role in the children being taken into state custody and that he continued to struggle with controlling his anger. Father wrote letters of apology to each child as requested, but each letter is identical and, in part, expresses his forgiveness of their actions. At the termination hearing, when questioned about the letters, he

---

[*] The children join DCF's brief in opposition to mother's and father's briefs and ask this Court to affirm the superior court's order terminating mother's and father's parental rights.

3

testified that he understood that his past actions were wrong and harmful to his children, but he also stated that he had to forgive himself before he could forgive them. This testimony demonstrated that he was still not fully accepting responsibility for his abusive conduct toward the children. Nor did father take responsibility for pornography in his home, first blaming his eldest child for its existence and then refusing to say whether it had been removed from the home. Father also suggests that he has learned to control his anger, but a service provider testified that she witnessed father's anger on numerous occasions throughout the family visits and her involvement with the family.

As for the need for stable housing, father and mother obtained housing in August 2012, nearly a year after the children had been taken into state custody. When they were evicted from their previous home in March 2012, it was in a deplorable and unsanitary condition, which was one of the main problems that had led to the children being taken into state custody. Father and mother then went without stable housing for several months. Father emphasizes that a social worker found the new house to be clean during her one visit, but that visit was relatively soon after mother and father had moved in, and when the social worker tried to visit the home later, no one answered the door. One clean visit after many years of the family living in unsanitary conditions was not a strong indicator that the parents had established long-term stable housing. In fact, the parents were behind on their rent at the time of the termination hearing.

In short, the record supports the court's finding of a substantial change of circumstances based on stagnation in any progress father and mother had made toward being able to care for their children. See In re J.R., 153 Vt. 85, 99 (1989) (defining stagnation as passage of time without improvement in parental capacity to care for children). Further, the record supports the court's conclusions that the children have made substantial progress in their individual development since being taken into state custody, and that neither father nor mother will be able to resume their parental duties within a reasonable period of time from the perspective of the children. See In re E.B. & M.B., 162 Vt. 229, 235 (1994) (stating that most critical factor is whether parents will be able to resume parenting duties within reasonable period of time).

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
John A. Dooley, Associate Justice

_____
Marilyn S. Skoglund, Associate Justice

4