### In re D.A., Juvenile

[772 A.2d 547]

No. 00-567

April 13, 2001. The Department of Social and Rehabilitation Services (SRS) appeals the family court's order denying its petition to terminate the parental rights of the parents of three-year-old D.A. We affirm.

The family court's findings are uncontested. D.A. was born on February 27, 1998. A few hours after his birth, he was transferred to Dartmouth Hitchcock Medical Center (DHMC), where pediatric surgeons repaired a congenital defect that resulted in food being ingested into his bronchial tubes. Notwithstanding the surgery, D.A.'s medical condition presents a constant danger that food will get caught in his esophagus and be sucked into his lungs, causing a severe asthma attack and blocking his airway. The condition is thought to be permanent but is expected to improve as the child gets older. D.A.'s condition requires that he eat soft foods, blended foods, or foods cut up into very small pieces. While eating, D.A. must remain erect and refrain from moving about. He must be encouraged to take liquids after every swallow to help food pass through his esophagus.

In March 1998, D.A. was discharged from DHMC and returned home to live with his parents, who had been taught the proper feeding procedures. In February 1999, while D.A. was at DHMC for surgical evaluation to determine what was causing his frequent gagging and vomiting, he experienced an episode of respiratory arrest after eating some crackers. Resuscitation and admission to an intensive care unit was required. D.A. remained at DHMC until June 1999. During this period, staff at the hospital attempted to teach D.A.'s parents how to care for his condition, but they were unsuccessful and contacted SRS. D.A. was ordered into SRS custody as a medically needy child and placed with foster parents who took special training at DHMC and were assisted in their home by nurses. During this period of foster care, D.A.'s parents were given additional training in how to care for D.A. On December 28, 1999, D.A. was returned to his parents after it was decided that mother had made adequate progress in learning to care for D.A., even though father had not. Mother was deemed primary caregiver, but she had back-up help from father, D.A.'s aunt, and in-home nurses.

During the first several weeks, with the benefit of twenty hours a day of nursing support, the plan for D.A.'s care at parents' home went well. Parents maintained a clean household, demonstrated adequate feeding procedures, and seemed comfortable using the various equipment required. In February 2000, however, the situation deteriorated. Parents were served an eviction notice for failure to pay rent. Their Medicaid coverage lapsed because of their failure to honor appointments. Mother cashed an assistance check and used the proceeds to pay for bills other than the ones for which the money had been designated. During this period, parents' motivation to care for D.A. seemed to wane. It appeared to the service providers that

parents were too overwhelmed with their financial difficulties to properly care for D.A. They bottle-fed D.A. in his crib, against the advice of the nurses, and they relied too heavily on formula rather than solid foods. They expressed less interest in attending medical appointments concerning D.A., and they failed to respond to some twenty oxygen alarms, mostly because they did not awaken. In response to criticism over these matters, parents became hostile to the service providers. As the result, the nursing association withdrew its services, and on March 1, 2000, SRS placed D.A. with legal-risk foster parents. D.A. thrived and bonded with the new foster parents, who expressed a willingness to adopt him.

In May 2000, approximately four months after D.A. was adjudicated a child in need of care or supervision, SRS filed a petition to terminate parental rights. Following three days of hearings in October 2000, the family court denied the petition. The court did conclude that parents' ability to care for D.A. as a special needs infant deteriorated during the time they had custody of the child. The court also concluded, however, that SRS had failed to demonstrate by clear and convincing evidence that parents would be unable to resume their parental duties within a reasonable period of time. The court noted that mother's significant health problems, which were discovered after D.A.'s birth, had improved significantly since D.A. was placed in foster care — she had surgery to alleviate conditions caused by sleep apnea and pancreatitis, was taking insulin to address a diabetic condition, and had lost a great deal of weight. As the result of mother addressing her medical problems, she was much less tired than when D.A. had been placed at home, and she became aware of the debilitating nature of her medical conditions, if left unaddressed. The court also noted that mother's attitude had changed with respect to the service providers. She recognized that SRS and DHMC had made the right decision to place D.A. in foster care. Based on these and other considerations, the court concluded that SRS had not given parents a sufficient opportunity to demonstrate their ability to care for D.A. within a reasonable period of time, and that none of the other statutory factors concerning the child's best interests outweighed this conclusion.

On appeal, SRS argues that the family court misconstrued the reasonable-period-of-time criterion by focusing on the quantum of time provided to the parents to demonstrate changed behavior, rather than on the likelihood that they would succeed in overcoming their deficiencies. According to SRS, in focusing solely on the time given to parents, the court ignored D.A.'s need for permanency and stability, which indicated that a reasonable period of time had already passed. Further, SRS contends that while mother's progress in coping with her life and addressing her medical problems is laudable, her progress does not demonstrate that she will be able to resume parental duties soon, even assuming a reasonable period of time has not already passed. In SRS's view, given D.A.'s history and the lack of a current parent-child relationship between him and his parents, it is inconceivable that either parent will be able to resume parental duties within a reasonable time frame consistent with D.A.'s pressing needs.

In making these arguments, SRS relies heavily on *In re B.M.*, 165 Vt. 331, 342, 682 A.2d 477, 483 (1996), a case in which we sympathized with the progress that the father had made in his personal life, but concluded that it was too late for him to act as a father to his daughter. While there are some similarities in the two cases, *B.M.* is not controlling. In *B.M.*, the father had never played a parental role in the child's life, but sought custody of her years after she had been placed in SRS custody. We acknowledged the progress father had made in his

personal life, but concluded that the family court's termination order was supported by its findings that (1) the child was not bonded with the father; (2) the father had never been a primary caregiver to the child; (3) because of incarcerations, the father had been absent for long periods of time when the child was young; (4) the child did not feel safe in the father's presence because of past incidents of domestic abuse; and (5) the child expressed great anxiety at the possibility of reunification with her father. *Id.* at 340-42, 682 A.2d at 482-83. Here, although the family court found that parents acted more as playmates to D.A. during visits, and that D.A. had bonded to his new foster parents, mother was D.A.'s primary caregiver when he was placed with her earlier, and D.A. has not been separated from his parents for a length of time comparable to that in *B.M.* Further, in contrast to the situation in *B.M.*, where the child was afraid of her father, the family court found that D.A. gets along well with his parents, and always has.

We do not agree with SRS that the family court focused exclusively on the amount of time parents had been given to demonstrate change rather than on the likelihood that they could succeed in overcoming their deficiencies. The findings of the court indicate that mother was able in the past, with the assistance of father and others, to act as D.A.'s primary caregiver. Because of financial problems and mother's medical conditions, which sapped her energy, parents' ability to care for D.A. deteriorated. Mother has addressed her medical conditions and has more energy. She has also acknowledged her previous deficiencies and recognized that service providers were right to place D.A. in foster care. If D.A. were returned to parents, mother's sister, who has two special needs children and has received specialized training, and D.A.'s grandmother would be available to assist parents in caring for D.A. All of these findings are directly tied to the likelihood of parents, and particularly mother, being able to resume parental duties within a reasonable period of time. Although it is true that the court made no explicit findings on D.A.'s need for permanency, the court's findings address each of the statutory best-interests factors contained in 33 V.S.A. § 5540. The testimony of an SRS social worker that children of D.A.'s young age need permanency, particularly when they have been moved around such as D.A., does not require, in and of itself, that we reverse the trial court's order denying SRS's petition. The social worker's brief statements do not necessarily demonstrate, by clear and convincing evidence, that D.A. will be harmed if his parents are given additional time to demonstrate that they can care for him.

The family court recognized that Vermont law is not intended to place troubled or needy children in the best possible homes, but rather must be construed to preserve the family unit if it can be done within a reasonable period of time without physically or emotionally harming the child. See *In re R.B.*, 152 Vt. 415, 421, 566 A.2d 1310, 1313 (1989) (because freedom of children and parents to relate to one another in context of family free of governmental interference is fundamental right, courts are constrained to achieve statute's stated purpose, whenever possible, in family environment, separating child from parents only when necessary for child's welfare). The awesome power of termination should be invoked only as a last resort when there is no " 'reasonable possibility that the causes and conditions which led to the filing of the petition can be remedied and the family restored within a reasonable time.' " *In re B.M.*, 165 Vt. 194, 199, 679 A.2d 891, 895 (1996) (quoting *In re D.R.*, 136 Vt. 478, 481, 392 A.2d 951, 953 (1978)). As in *In re M.M.*, 159 Vt. 41, 613 A.2d 713 (1992), where we

rejected an argument similar to the one SRS makes here, D.A.'s parents presented coherent testimony in favor of allowing them more time to improve their parenting skills. Accordingly, "[w]e will not substitute our judgment for that of the family court, and we will not reverse its conclusion, based on uncontested findings, that SRS had not established by clear and convincing evidence that termination of parental rights was appropriate." *Id.* at 46, 613 A.2d at 716 (citation omitted).

*Affirmed.*