2013 VT 58

## In re B.C., Juvenile

[81 A.3d 1152]

No. 13-073

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed August 2, 2013

Motion for Reargument Denied August 29, 2013

*Matthew F. Valerio*, Defender General, and *Joshua S. O'Hara*, Appellate Defender, Montpelier, for Appellant.

*William H. Sorrell*, Attorney General, Montpelier, and *Kristin L. Clouser* and *Wendy Burroughs*, Assistant Attorneys General, Waterbury, for Appellee.

*Michael Rose*, St. Albans, for Appellee Juvenile.

¶ 1. **Skoglund, J.** Father appeals from a judgment of the superior court, family division, terminating his parental rights to the minor B.C. Father contends the trial court erroneously: (1) denied parent-child contact in violation of his fundamental rights; (2) denied a request for an independent mental examination of the child; (3) made unsupported findings; and (4) erroneously applied the statutory best-interests criteria. We affirm.

¶ 2. The record reveals a rather tangled factual and procedural history. B.C. was born in May 2004. A parentage order in May 2006 awarded mother sole parental rights and responsibilities, and granted father visitation. Thereafter, the Department for Children and Families received reports concerning mother's use of drugs, abuse of the child, and involvement with sex offenders. For a period of time, mother entrusted care of the child to her father, the child's maternal grandfather, and after he became ill, the child was cared for by his maternal grandmother. In May 2011, a probate court order granted guardianship to the maternal grandmother.

¶ 3. Shortly thereafter, DCF received a number of reports from the child's pediatrician and school that B.C. was engaging in extremely aggressive behavior, making sexualized remarks, and threatening suicide. He was seven years old at the time. In early June 2011, B.C. was admitted to the Baird Center. A psychological evaluation found that he met the diagnostic criteria for PTSD and possibly Reactive Attachment Disorder. He was released to his

grandmother but readmitted to Baird on June 29, 2011, after she reported that he was violent, destructive, and out of control. He was taken into custody by DCF that day and adjudicated CHINS in August 2011.

¶ 4. B.C. remained at Baird until October 2011, when he was transferred to a therapeutic foster home. During the period at Baird, father and other family members were afforded weekly hour-long visits and telephone calls. Visits were suspended for a time because family members had behaved poorly in the child's presence; Baird staff observed that B.C. was less frustrated and irritable during this hiatus. At a subsequent hearing, a Baird clinician recalled that B.C.'s anxiety and aggression became escalated when he was anticipating family visits, and that he required more intensive one-on-one supervision to stay regulated after visits. The clinician recalled that family visits were suspended in October 2011 to help B.C. transition to his first therapeutic foster home, explaining that continued contact would have been "incredibly stressful" for B.C.

¶ 5. A scheduled disposition hearing in September 2011 was continued to provide additional time for completion of a psychological evaluation of father by Dr. William Nash, a clinical psychologist. A completed evaluation and case plan were presented at the rescheduled hearing in December 2011. The disposition report observed that B.C.'s "out of control, aggressive, self-harming and sexualized behaviors" indicated that he had been traumatized, exposed to abuse and neglect, and suffered emotional harm over an extended period; that his family had placed him in chaotic situations; and that all members of the family had unresolved mental health issues. As to father, the report noted that he had cognitive impairments which "impact[ed] all aspects of life" and required that he obtain "support with attending to basic issues," and observed that father lacked any "understanding of [B.C.'s] special needs" or the "skills to meet" them. The report concluded that B.C. was in immediate need of permanence in view of his age and developmental needs and that it was critical he develop a secure attachment to a permanent caregiver. The plan contemplated eventual reunification with mother and called for both parents to engage in extensive services.

¶ 6. The report from Dr. Nash was submitted in response to DCF's request for a "psychological profile to assist in future planning" for the child's placement. Dr. Nash noted father's

general reliance on his mother to interpret and explain what was happening, observing that father often appeared to "parrot" her statements with "only marginal comprehension." Father reported that he received SSDI payments and did odd-jobs, that he had stopped using cocaine but continued to regularly smoke marijuana, and that he helped with the cooking and cleaning for his current wife, her two young children, and their infant child but that he could not perform these tasks without supervision or assistance. Father's overall I.Q. was 58, which Dr. Nash later likened to the intellectual functioning of a seven or eight year old. Dr. Nash concluded that, although father could benefit from training and support, he would likely always need assistance with "independent living skills, and tasks of daily living."

¶ 7. At the disposition hearing in December 2011, the trial court heard from counsel, including father's attorney who argued for an immediate transfer of custody to B.C.'s paternal grandparents. The court adopted the case plan goal, but held no evidentiary hearing. Two days later, the child's attorney — dissatisfied with the plan — filed a petition to terminate parental rights. In January 2012, father appealed the disposition order. While these matters were pending, in February 2012, the court held a pretrial hearing in which the State indicated that it was joining the juvenile's termination petition, and father renewed his request to transfer custody to himself or his father, or issue a visitation order. The State explained that visits had been suspended to aid the child's transition to a therapeutic foster home, and the court ruled that father's counsel should submit a written request for visitation and the matter would be set for a hearing. No such request was submitted.

¶ 8. In May 2012, the trial court held a one-day termination hearing. Mother appeared and voluntarily relinquished her parental rights, and the hearing proceeded with respect to father. Dr. Nash discussed the results of his psychological evaluation, recalling father's admission that he hoped to obtain custody and then let his mother "kind of take over and raise the child." A DCF social worker updated the court on B.C.'s placements, explaining that he was removed from his first therapeutic foster home because there was another child in the house whom he had threatened. He was subsequently placed with another experienced therapeutic foster parent, a single woman, whom he attacked, resulting in a hospitalization at the Brattleboro Retreat and later

a return to Baird. The DCF clinician testified that father had experienced challenges in following the case plan, observing that he relied on his mother or wife to answer questions or provide information. He had engaged in some parenting training but "continue[d] to lack an understanding of how significant B.C.['s] needs are." B.C.'s paternal grandparents, who were divorced, also testified, explaining that they had largely taken care of the child during his visits with father under the original parentage order, and were prepared to do so again. The paternal grandmother stated that she had not witnessed any problems with B.C. over the years. The paternal grandfather felt that he could handle any problems that the child presented, and planned to bring him to his wife's daycare center.

¶ 9. While the matter was under submission, the parties agreed to vacate the original disposition order on appeal to this Court, and we issued an order in July 2012 remanding the matter to the trial court for a new hearing. In August 2012, father filed a request with the trial court for immediate visitation. The following month, the State filed a renewed petition for termination of parental rights and a new disposition report recommending a goal of termination.

¶ 10. The court held an evidentiary hearing on the visitation motion in October 2012. B.C.'s therapeutic case manager at Baird testified to the severe challenges confronting the child's previous therapeutic foster parents and current therapists and care providers at Baird. He stated that B.C. requires extensive one-on-one attention by experienced clinicians able to identify the circumstances that lead to escalations in his mood, threats, and aggression and respond to them appropriately, and observed that "minimal changes" in his routine lead to "pretty aggressive behavior." Citing its authority under 33 V.S.A. § 5319(a) to deny parent-child contact if necessary for "the protection of the physical safety or emotional well-being of the child," the court found that B.C.'s emotional well-being required that visits remain suspended pending the new disposition/termination hearing scheduled for December 2012. Although father appealed the ruling, we dismissed the appeal as premature in view of the ongoing proceedings.

¶ 11. The court held a new evidentiary hearing over the course of two days in December 2012.* B.C.'s current therapist at Baird testified that she worked with him five days a week for one to four hours a day; that his symptoms of PTSD, including sensitivity to other people and loud noises, aggression toward other children and staff, violent behavior, and night terrors remained strong and persistent; that he required an "experienced caretaker" with knowledge of childhood trauma, the skills and insight to "de-escalate" aggression, and the ability to provide structure and consistency; and that, given his young age, B.C.'s long-term prognosis would not be good if he failed to find a stable environment with trained care providers. She also noted that B.C.'s propensity for aggression and violence made it important that he not be in a home with other children, and explained that she had not supported renewed contact with father because B.C. was "clinically fragile." She characterized B.C. as "one of the most severely traumatized kids" that she had worked with in eighteen years, and opined that, even with significant assistance, he would require long-term treatment.

¶ 12. The DCF social worker who testified at the previous hearing in May 2012 also appeared, observing that the two previous unsuccessful community placements with therapeutic care providers demonstrated the extreme difficulty of providing B.C. with a safe placement, and that father's cognitive limitations and limited progress with service providers showed that he could not provide the necessary care for B.C. Also testifying was a therapist who had conducted a "trauma consultation" with B.C. and submitted a written report of her findings. She echoed the testimony of B.C.'s other therapists on the "very challenging task" of providing a safe and stable environment for B.C. and of his critical need "for intensive routine and ritual — a highly structured, predictable day, seven days a week, twenty-four hours a day." She stated that he would require such "intensive intervention over the next several years" and "into the foreseeable future."

¶ 13. Father also testified, expressing the view that he could control B.C. with "time outs," and that he did not believe B.C. would hurt the other children in his family. At the conclusion of

---

* The parties agreed that the court could take judicial notice of the testimony at the prior May 2012 hearing provided that the witnesses were available for further examination.

the hearing, the court denied father's renewed request for immediate visitation, finding that it would be contrary to B.C's interests based on the testimony presented.

¶ 14. The court issued a written decision in February 2013. While acknowledging father's love for B.C. and the distress caused by his separation from the child, the court found that the evidence showed B.C. to be "a deeply traumatized and emotionally disturbed young boy"; that father did not "appreciate the extent of [B.C.'s] needs"; and that neither he nor the paternal grandparents could provide the specialized care he required. The court noted in this regard that, despite the provision of intensive family-based services, experienced therapeutic care providers, mobile-crisis services, respite care, and alternative educational services, B.C.'s two community foster-care placements had not been successful. While also acknowledging the frustration of returning to the disposition stage one year after the original order, the court found that any hope of reunification with father was as futile now as it was then. Despite father's efforts, the court found that he did not understand B.C.'s needs and could not provide a safe and stable home in which both B.C. and father's other children would be safe. Concerning the parent-child relationship, the court noted that father had played a very limited caretaking role before DCF intervention, and that he had no contact with the child since October 2011, a separation which it found was justified by the concerns of the therapists then treating B.C. The court concluded that it was unlikely father would "ever be able to provide the skilled care necessary for [B.C.'s] needs," and thus that there was no likelihood he could resume parental responsibilities within a reasonable period of time. Accordingly, it granted the petition to terminate parental rights. This appeal followed.

¶ 15. Father contends the suspension of parent-child contact from October 2011 until the decision in February 2013 "effectively terminated" his parental rights without a hearing or finding of unfitness, in violation of his fundamental right to parent his child. As summarized earlier, DCF suspended father's visits with B.C. in October 2011 based on his therapists' concerns that they were emotionally disruptive and would impair his transition to a therapeutic foster home. An earlier scheduled disposition hearing in September was continued to December 2011, where father requested that custody be immediately transferred to the child's paternal grandparents, and that he be granted visitation. Without

holding an evidentiary hearing, the court adopted the case plan recommended by DCF, which did not provide for any visitation with father. At a pretrial hearing in February 2012, five months after contact was suspended, father again requested a transfer of custody to himself or his parents, or, alternatively, that visitation be ordered. The court directed father's counsel to submit a written request and indicated that the matter would then be set for a hearing. Father filed no motion then or at the subsequent termination hearing in May 2012. In August 2012, ten months after visits were suspended, father filed a specific request for visitation, which resulted in an evidentiary hearing and a ruling by the trial court that immediate visitation would be detrimental to the child's emotional well-being. A renewed request for immediate visitation at the conclusion of the termination hearing in December 2012 was also denied by the trial court as detrimental to the child's best interests based on the evidence adduced at the hearing.

¶ 16. ■■ ■ It is certainly true that the State may not effect a permanent termination of parental rights without a showing of parental unfitness by clear and convincing evidence. See *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (recognizing parents' essential right to conceive and raise children, which may not be terminated without hearing on fitness); *In re A.D.*, 143 Vt. 432, 435, 467 A.2d 121, 123 (1983) ("The clear and convincing evidence test must be used in cases involving the permanent termination of parental rights."). We have also recognized, however, that state intervention which effects only a temporary deprivation of parental rights requires a lesser showing of proof by a preponderance of the evidence. *In re A.D.*, 143 Vt. at 435, 467 A.2d at 123 (holding that CHINS adjudication may be entered based on preponderance of the evidence that child is in need of care or supervision). The statutory scheme governing permanency proceedings expressly authorizes the suspension of parent-child contact while the child is in DCF custody if "necessary . . . [for] the protection of the physical safety or emotional well-being of the child." 33 V.S.A. § 5319(a). This provision clearly contemplates a temporary deprivation of rights, and therefore may be satisfied by a preponderance of the evidence showing that a suspension of contact is necessary for the protection of the child's physical or emotional safety.

¶ 17. ■ Contrary to father's claim, neither the statute nor its application here contravenes our decision in *Mullin v. Phelps*, a custody dispute in which we held that the trial court could not, absent a finding of unfitness by clear and convincing evidence, effectively terminate a father's parental rights by suspending parent-child contact until he acknowledged responsibility for a disputed claim of sexual abuse, a condition which the trial court acknowledged would likely never be satisfied. 162 Vt. 250, 263, 647 A.2d 714, 721 (1994); see also *In re A.D.*, 143 Vt. at 435-37, 467 A.2d at 123-24 (holding that nonpermanent deprivations of parental rights are governed by preponderance-of-evidence standard). This case did not involve any condition of a similar nature. Although, in retrospect, the suspension of father's contact with B.C. in the fall of 2011 led to a permanent termination of his parental rights, at the time the suspension was temporary and did not purport to permanently cut off his parental rights. Accordingly, no finding of unfitness was required at that time, and we find no deprivation of father's fundamental rights.

¶ 18. ■ We are troubled by the lengthy delay of over a year between DCF's suspension of contact and any court findings supporting that suspension pursuant to the statute. This delay resulted first from the continuance of the initial disposition hearing and then from the trial court's failure to hold an evidentiary hearing or make findings on the issue of parent-child contact before issuing a disposition order, and its subsequent failure to address the issue at the post-disposition review. Nevertheless, we are not persuaded that the omission — even if erroneous — was prejudicial to father's interests. See *In re R.W.*, 2011 VT 124, ¶ 17, 191 Vt. 108, 39 A.3d 682 (noting that we employ the harmless error standard in termination cases, and will reverse the judgment only where the error affected a substantial right of the party). Although the trial court noted father's extended lack of contact with the child, it did not give this factor substantial weight in its decision, which was predicated — as noted — on father's minimal experience in caring for the child prior to DCF intervention and the substantial evidence that neither father nor his family appreciated and could attend to the child's very extensive and significant needs. Accordingly, we find no grounds to disturb the judgment on this basis.

¶ 19. Father next contends that the trial court abused its discretion in denying his request for a court-ordered mental

examination of B.C. by an expert of father's choosing. In November 2012, father moved for such an examination pursuant to Vermont Rule of Civil Procedure 35(a), which provides that, when the mental condition of a party or a person under the legal control of a party is in issue, the court may order the person to submit to a mental examination by a suitably licensed examiner. The State opposed the request, and the court held a hearing on the motion in early December 2012. Father argued that the examination was necessary to evaluate "the relationship between B.C. and his father." The State maintained that the additional evaluation was unnecessary in light of the many previous evaluations of B.C. by a variety of mental health professionals, as well as the comprehensive psychological evaluation of father previously conducted by Dr. Nash. The court also expressed concern that subjecting B.C. to yet another evaluation could be detrimental to the child. At the conclusion of the hearing, the court indicated that it required more information before it could decide whether an additional evaluation was necessary, and deferred ruling on the request until the evidentiary hearing scheduled for later that month. In its subsequent written decision the court denied the request, observing that father questioned none of the existing evaluations and diagnoses of B.C., and concluded that an additional examination was not in the child's best interests.

¶ 20. ■ ■ We have held that court-ordered mental examinations pursuant to Rule 35 "are not to be granted as a matter of right" but require a showing of "good cause." *In re C.E.E.*, 139 Vt. 65, 68, 421 A.2d 1312, 1314 (1980). Here, the record contained multiple mental health evaluations of B.C., a comprehensive psychological evaluation of father, and extensive evidence in both the reports and the trial testimony concerning father's cognitive capacities and ability to parent a child with B.C.'s special needs. There was also compelling testimony by the "trauma consultation" therapist concerning her two separate attempts to interview B.C. in August 2012 that resulted in the child showing increased aggression and violence so severe that it required police intervention. We thus find no basis to conclude that the trial court abused its discretion in ruling that the additional evaluation was unnecessary and potentially detrimental to B.C.'s interests.

¶ 21. Father next contends that the evidence failed to support a number of the trial court's findings. Our review in this regard is limited. We will uphold the trial court's findings unless clearly

erroneous and its conclusions if reasonably supported by the findings. *In re K.F.*, 2004 VT 40, ¶ 8, 176 Vt. 636, 852 A.2d 584 (mem.). When findings are challenged on appeal, "our role is limited to determining whether they are supported by credible evidence," leaving it to the "sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." *In re A.F.*, 160 Vt. 175, 178, 624 A.2d 867, 869 (1993).

¶ 22. ▮ Father first claims that the court erred in attributing to Dr. Nash the opinion that father has "not shown that he understands the impact of [B.C.'s] trauma, is not able to meet [B.C.'s] complex needs and the complex interventions necessary to keep [B.C.] safe." Dr. Nash's evaluation was expressly designed to provide a "psychological profile [of father] to assist in future planning for the child in custody." While acknowledging that he had not conducted a "formal parenting assessment," Dr. Nash concluded generally that father could not attend independently to the "tasks of daily living" and that it was unlikely "even with a high degree of training and encouragement [that father] could raise his functional capacity significantly," a capacity he characterized as tantamount to that of seven or eight year old. While Dr. Nash observed that father might benefit from some training, he did not believe that it would "raise his functional capacity significantly." The trial court could reasonably infer from these findings that father could not understand or attend to B.C.'s needs. We note, as well, that DCF case workers who worked with father also testified that he had shown neither insight into B.C.'s significant emotional problems nor the ability to meet them. Thus, we find no clear error.

¶ 23. ▮ ▮ Father also claims that the court erred in attributing to B.C.'s current DCF therapist and other DCF clinicians the view that contact with father would be detrimental to B.C.'s emotional well-being. Although father is correct that the evidence did not show that B.C. suffered direct harm during visits with father, there was testimony that B.C. showed increased agitation and aggression both before and after such visits. His current therapist also testified that she opposed visits because B.C. was "clinically fragile" and father's presence would be emotionally disruptive. We thus find sufficient support for the trial court's findings that B.C. "was not reacting well to having visits with his family," and that his current counselor did not support renewed

contact with father "due to his fragile emotional condition." Lastly, father contends that there was no support for the court's finding that he had played a "relatively limited role" in caring for the child before DCF's intervention. The record evidence was clear, however, that the paternal grandparents were the child's primary care providers during visits with father. Accordingly, we discern no basis to disturb the finding.

¶ 24. Father claims the trial court erred in applying the statutory criteria to conclude that termination was in the best interests of the child. Again, "[o]ur role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating [father's] parental rights." *In re S.B.*, 174 Vt. 427, 429, 800 A.2d 476, 479 (2002) (mem.). With respect to the child's "adjustment to his or her home, school, and community," 33 V.S.A. § 5114(a)(2), father contends the court improperly shifted the burden of proof in noting that there was "no credible evidence that [B.C.] would adjust well to being placed with his family." Viewed in context, the court was not requiring father to show that B.C. would adjust well to his home, but was refuting the argument that the child's complete failure to adjust to alternative community placements somehow supported a placement with father or militated against termination. The evidence that B.C. requires even more structure, discipline, and counseling than trained therapeutic foster parents were able to provide did not, however, support a placement with father, whom the evidence showed to be largely incapable of understanding or attending to B.C.'s extensive needs.

¶ 25. Father also asserts that the evidence did not support the court's critical conclusion that he would not be able to resume parental responsibilities within a reasonable period of time. See *In re B.M.*, 165 Vt. 331, 336, 682 A.2d 477, 480 (1996) ("The critical factor is whether the natural parent will be able to resume parental duties within a reasonable period of time."). He claims that the court incorrectly assumed that father must be able to care for the child independently, and overlooked evidence of the paternal grandparents' willingness to assist, as they had in the past. See, e.g., *In re D.A.*, 172 Vt. 571, 573, 772 A.2d 547, 550-51 (2001) (mem.) (evidence that child's aunt and grandmother would provide assistance supported finding that mother would be able to resume parental responsibilities). On the contrary, the court

expressly found that, in light of the overwhelming evidence of B.C.'s extreme trauma and need for trained care providers to provide a safe and stable environment, neither father nor B.C.'s paternal grandparents could provide for B.C.'s highly specialized needs. Father also claims that the evidence that B.C. would require such specialized care for years to come somehow militated against the need for immediate termination, but this overlooks the fundamental requirement that a reasonable time must be measured from the viewpoint of the child's needs, and the substantial evidence attesting to B.C.'s critical need for permanence immediately, while he was still relatively young. See *In re C.P.*, 2012 VT 100, ¶ 30, 193 Vt. 29, 71 A.3d 1142 (reaffirming principle that reasonableness of time to resume parenting "is measured from the perspective of the child's needs, and may take account of the child's young age or special needs" (citations omitted)).

¶ 26. ▆▆▆ Finally, father contends the court erred in finding that he had not played a significant role in B.C.'s life, and by considering a factor beyond his control — the lack of visitation. We have already noted that the evidence supported the court's finding that father's role in caring for the child was limited. As for the suspension of visits, as noted, the trial court did not give it substantial weight in its ruling, which was based fundamentally on the inability of father or his extended family to understand or address B.C.'s extensive needs now or in the future, and thus his inability to resume parental responsibilities within a reasonable time. Accordingly, we find no basis to disturb the judgment.

*Affirmed.*