VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.     24-AP-245



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

DECEMBER TERM,   2024

| | |
|---|---|
| In re A.G., T.A., J.A., B.A., Juveniles (J.A., Father*) | APPEALED FROM:<br><br>Superior Court, Chittenden Unit;<br>Family Division<br>CASE NOS. 23-JV-00486, 23-JV-00487,<br>23-JV-00488 & 23-JV-00489<br>Trial Judge: Elizabeth Novotny |

In the above-entitled cause, the Clerk will enter:

Father appeals from an initial disposition order in this juvenile matter involving his daughter, A.G., and sons T.A., J.A., and B.A. He argues that the family division erred in affording him inadequate parent-child contact during the pendency of the case and discharging custody to mother—the custodial parent prior to the initiation of the proceedings—at disposition where he had thus been deprived of a meaningful opportunity to demonstrate his parenting ability. We affirm.

Mother and father are the parents of A.G., born in October 2012; J.A., born in October 2013; B.A., born in February 2015; and T.A., born in February 2018. In April 2023, the State filed petitions seeking determinations that they were children in need of care or supervision (CHINS). The supporting affidavit alleged that: (1) A.G., J.A., and B.A. were frequently absent from school without excuse and, as a result, were academically behind and had not received special-education services to which they were entitled under their respective individualized education programs; (2) unsanitary conditions in mother's home posed risks to the children's health and safety; and (3) B.A. reported that father had recently been staying in the home, that he felt unsafe because father "hits everyone," and that father had been hitting him in the head and with a belt—and, although B.A. later attempted to retract these statements, he had visible injuries consistent with the reported abuse. The affidavit also noted that over the course of years, the Department for Children and Families (DCF) had received numerous reports about the family reflecting ongoing concerns of domestic violence and physical abuse.

On the date the petitions were filed, the children were in mother's custody pursuant to a final relief-from-abuse (RFA) order she obtained against father on behalf of herself and the children. The order provided that if the State initiated CHINS proceedings, father's parent-child contact was to be as determined by the court in those dockets. It modified a temporary parent-child contact order which had been issued in parents' parentage case in December 2022.

The court placed the children in DCF custody under emergency- and temporary-care orders. The temporary-care order provided that both parents were to have supervised parent-child contact as arranged with DCF, and that father's visits with the children would initially be by video because he lacked transportation and was living in Rutland while the children needed to be in school in Winooski, and there was a need to "sort out" the children's feelings about having contact with father.

During a May 2023 hearing, mother stipulated to the merits of the State's petitions. She agreed that DCF had received truancy reports regarding the three school-age children and that police had observed her home to be in unsanitary condition and removed some of the animals living there as part of an animal-cruelty investigation. The court issued a post-hearing order noting that mother alleged father was abusive, father alleged that mother was engaging in parental alienation, A.G., J.A., and B.A. were refusing to speak with father, T.A. had behavioral issues after his contact with father by phone, there was no clear parent-child contact schedule in place, and DCF was coordinating visits "as therapeutically recommended." It approved a modification of the temporary-care order allowing mother to have unsupervised parent-child contact at DCF's discretion.

The following month, DCF filed a disposition case plan with a goal of reunifying the children with one or both parents within six months. As relevant here, the plan—prepared in April—noted the following. Father consistently demonstrated a desire to have visits with his children and was "communicative with DCF and other resources," though this communication had, in some instances, been difficult. Father was told that the children's therapeutic providers did not recommend they have visits with him "at this time," unless those visits "focus on reparative work regarding his past physical abuse of the children and history of domestic violence against [mother]." However, father disagreed with these recommendations and refused to engage in such work, insisting that he had not physically abused mother or the children. DCF explained that it planned to utilize the six-month reunification period "to access and offer [father] services as well so that he can have the opportunity to have safe and consistent parent-child contact with his children." The proposed action steps for father included participating in the Nurturing Fathers Program through Prevent Child Abuse Vermont, engaging in reparative work with the children as recommended by their therapeutic providers, and meeting with DCF's domestic violence specialist and engaging with any recommended programming.

DCF filed an updated case plan prior to the disposition hearing scheduled for July 2023. The revised plan proposed additional action steps for father, including participating in the Parenting with Respect program hosted by Prevent Child Abuse Vermont.

At the beginning of the July hearing, the court indicated that it would address mother's pending motion for conditional custody. The State did not oppose the motion, but father objected to both the disposition case plan and the proposed conditional-custody order. As a result, the court reset the disposition hearing and took evidence on mother's motion. The DCF worker assigned to the case testified that mother had been doing everything requested of her: the children attended school consistently prior to the summer break, and mother's home was clean during each unannounced visit. She explained that A.G. had developmental delays, J.A. and B.A. had behavioral needs, and T.A. had cerebral palsy, and mother had successfully balanced their various appointments with getting them to school after they were placed back in her care in May. She also testified that the children had indicated that they did not want contact with father, and DCF was still endeavoring to engage father with the recommended domestic-violence

programming and reparative work before revisiting whether in-person parent-child contact was therapeutically appropriate.

The court issued a conditional custody order to mother. It noted that several logistical issues were impacting father's ability to have contact with the children, including the distance between the parents' respective residences, father's lack of a valid driver's license, and mother's inability to supervise visits between father and the children given the court's concerns about domestic violence. It explained that "there needs to be some sort of contact" between father and the children, and ordered that DCF, mother, and father hold a team meeting to address parent-child contact.

The disposition hearing was rescheduled for September 2023. For the reasons discussed below, the court did not finish taking evidence on that date, and additional disposition hearings were held in November 2023 and January and August 2024.

At the September hearing, which was held remotely, the parties provided an update about the team meeting ordered by the court and father's subsequent visits. The children's attorney reported that the meeting was "quite productive" and resulted in an agreed contact schedule, expressing appreciation for DCF's efforts to facilitate the visits. Counsel for mother reported that since the meeting, father had been having three-hour visits with the children in the community once a weekend, supervised by his mother, and that these visits had gone well except that J.A. had refused to attend one of the visits. Father's counsel agreed that since the team meeting, his parent-child contact "seem[ed] to be moving forward in a positive direction."

The parties did not finish presenting evidence as to disposition before the conclusion of the hearing. In a subsequent order, the court noted that father's behavior had been disruptive to the proceedings—he disregarded the court's order to stay silent until called upon to speak, continuing to unmute himself after the judicial assistant muted him and interrupt the hearing.

In November 2023, the State moved for a disposition order returning unconditional custody to mother, noting that she had satisfactorily addressed all of the concerns underlying the CHINS proceeding while awaiting disposition. At the same time, DCF submitted a status report indicating that it supported closing the cases because mother had achieved all of the action steps in the proposed disposition plan. The report explained that father continued to refuse to engage in case-planning efforts, and that the only remaining unresolved issue, from DCF's perspective, was parent-child contact. DCF observed that while father was requesting overnight visitation at his mother's home, the agency would not support such contact until father met with the domestic-violence specialist, followed through with any resulting treatment recommendations, and completed at least half of the Nurturing Fathers Program.

After the November hearing, the court issued an order including the following observations. Father was "significantly late" to the hearing, citing car troubles. The court and parties discussed the best use of the hearing time. The court indicated if the parties agreed to a disposition order discharging custody to mother, the only remaining issue would be the terms of father's parent-child contact. The parties agreed to use some of the hearing time to attempt to negotiate an agreed contact schedule. When they returned indicating that they could not agree, the court "spent time trying to resolve this issue which centered on father's transportation barriers, whether his visits should be supervised[,] and the transition to increased contact." However, father left the courtroom abruptly and, after being retrieved by his attorney, began to argue with the court and disregard its instructions. The court ultimately placed father under oath and allowed him to testify briefly. He denied engaging in domestic violence, indicated that he

3

would be unwilling to participate in the Nurturing Fathers program unless ordered by the court, and expressed concern that the children were unsafe in mother's home because she was in a relationship with an individual previously convicted of a sex offense. As the end of the hearing approached, father's counsel disclosed, for the first time, that father was not in agreement with a discharge of custody to mother. As a result, the court indicated that it would reset the matter for a full hearing on the disposition case plan, noting that that this would leave less hearing time to address parent-child contact. The court directed the parties to confer in good faith regarding visitation and reach agreement on as many issues as they could in advance of that hearing.

In December 2023, father filed a motion seeking to enforce and modify the parent-child contact schedule. He represented that mother, father, and DCF had continued to hold monthly team meetings regarding father's parent-child contact, and that mother and DCF failed to honor an agreement—entered during one of these meetings—that father could have supervised overnight visits after his mother's driver's license was reinstated. He requested that the court issue an order adopting weekend overnight visits, lift the supervision requirement entirely, and allow his partner to participate in visits.

Father filed a second motion to enforce parent-child contact at the end of January 2024 in which he requested the same relief and asked the court to order a "makeup visit" based on allegations that mother refused to bring the children to a recent visit.

The disposition hearing continued on the same day, although it was delayed to allow the court to attend to father's outstanding warrant. The parties and court again discussed the proposed disposition plan. Father raised concerns about mother's partner having contact with the children based on his prior conviction. DCF indicated that it did not have concerns because the partner's offense was over twenty years ago, and he successfully completed sex-offender counseling at that time. However, mother agreed that her partner could be included in the disposition plan, and that her own action steps could be amended to include a requirement that she complete counseling about how to identify sexually predatory grooming behaviors. Father indicated that he would not complete two recommended domestic-violence programs proposed by DCF unless ordered by the court. The State called the DCF worker to testify to the reasons for the action steps, and father stood up and walked out of the courtroom. In its order, the court indicated that the evidence on disposition had not been completed and scheduled a further hearing. It directed DCF to file an amended disposition plan consistent with the parties' agreement at the hearing. As the hearing concluded, the court noted that father's choices in appearing late for hearings and engaging in disruptive behavior had impacted its ability to move through the case. It indicated that the hearing time had ended and it would not "address[] parent-child contact at this time."

DCF filed the amended initial disposition plan in April 2024. The conclusion of the disposition hearing was scheduled to occur the same month. However, prior to the hearing, father's counsel moved to withdraw. Father failed to appear at the hearing the court scheduled on this motion. After father appeared at a rescheduled hearing, the court granted the motion and assigned new counsel for father. The continuation of the disposition hearing was ultimately reset for August 2024.

At that hearing, the court heard additional testimony from the DCF worker and mother. It admitted exhibits including a video mother had taken of a 2022 incident involving father and the children. The DCF worker testified that father had not been having visits with the children since the late winter because he no longer had an approved supervisor. The agency had

4

withdrawn its approval of father's mother as a supervisor after she indicated that she would not enforce its limitations on visits. The worker testified that DCF was concerned that the children had frustrations with father which had not been repaired, and that, during visits, father was attempting to gather information adverse to mother, reinforcing the power and control model within domestic violence. As a result, the agency felt it was vital that father participate in domestic-violence accountability programming. The court did not hear testimony from father, because he again left the courtroom during the hearing.

At the conclusion of the hearing, father's counsel objected to the discharge of custody to mother, arguing that he had not received adequate assistance of counsel in connection with his objections to the proposed disposition. The court found this argument without merit, explaining that father had been appropriately represented throughout the case and the issues at disposition were narrow, involving only mother's partner and father's objection to the action steps involving domestic-violence programming. The court noted that the case had been delayed for reasons largely attributable to father: he was late to proceedings, interrupted proceedings, and left the courtroom during hearings. During the time that passed as a result, mother completed all her action steps, including the additional steps she agreed to in connection with her partner. It concluded that to the extent father's new counsel had not been able to introduce the evidence she wished to at the hearing, this was solely because father made the choice to leave the courtroom.

The court then made the following findings on the record. Based on mother's testimony and the video, it concluded that father engaged in domestic violence toward mother and all four children in 2022. During the incident in question, mother came home with the children to find father under the influence of alcohol. Father choked mother to the point that it interrupted her breathing and pushed B.A. into a couch, bloodying his nose. Father ultimately ended up on the floor in a pool of his own urine, holding A.G. tightly in a "chokehold" and then a "headlock" while she was visibly upset and screaming. At the same time, father pinned T.A.—also screaming—under his leg, in the puddle of urine. T.A. is "physically fragile" due to a medical condition and "needs to be handled with great care." During this incident, J.A. was yelling for father to release his siblings and struggling to pull T.A. from under father's leg as father continued to pin him down.

The court also found that during the portion of the proceedings in which father was having visits with the children, they experienced significant and negative behavioral changes and, when visits stopped because father's mother could no longer supervise, the children "all around did better."

The court concluded that there was ample support for the requirement that father engage in domestic-violence programming. It noted that father had completed counseling with a licensed drug-and-alcohol counselor to address the loss of his driver's license, but this was "not domestic violence counseling nor should it be regarded as a substitute." It explained that completion of the two recommended domestic-violence programs, "at a bare minimum," was necessary for father to establish a healthier bond with the children. This, the court reasoned, would be the only ground to keep the case open at this point—but it was not in the children's best interests to do so, because mother had completed all of her action steps, including those she agreed to in relation to her partner, and was "ready, willing, and able to resume custody." It concluded that based on the history of domestic violence involving father, the trauma the children had experienced as a result, their behavioral changes following visits with father, and T.A.'s medical fragility, it was also in the children's best interests that father's visits be supervised until he completed the domestic-violence programming.

5

The court issued a disposition order returning unconditional custody of the children to mother and awarding father supervised parent-child contact. The order indicated that father's successful completing of Parenting with Respect and a certified domestic-violence accountability program could represent a change in circumstances that would support a motion to strike the supervision requirement in the domestic docket. This appeal followed.

Father first argues that the family division erred in failing to afford him "reasonable" parent-child contact prior to disposition. In CHINS proceedings, parent-child contact is governed by 33 V.S.A. § 5319. In re A.M., 2019 VT 79, ¶ 11, 211 Vt. 198. Under that provision, the family division "shall order parent-child contact unless the court finds that it is necessary to deny parent-child contact because the protection of the physical safety or emotional well-being of the child so requires," and "[e]xcept for good cause shown, the order shall be consistent with any existing parent-child contact order." 33 V.S.A. § 5319(a).

Father seems to suggest that under § 5319(a), the court was bound to enforce the temporary order on parent-child contact issued in the parties' domestic case in December 2022 absent a finding of good cause. However, as noted above, at the time the CHINS petitions were filed, that order had been superseded by the final RFA order. The final RFA order provided that if the State initiated a juvenile proceeding, parent-child contact was to be determined in that case. As a result, there was no "existing" contact order, and no requirement that the court find good cause to deviate from it under § 5319(a).

Father also argues that the court violated § 5319(b) by failing to make findings supporting the conditions imposed on his parent-child contact prior to disposition. Under subsection (b), the court "may determine the reasonable frequency and duration of parent-child contact and may set such conditions for parent-child contact as are in the child's best interests, including whether parent-child contact should be unsupervised or supervised." Id. § 5319(b). He contends that the court essentially delegated the issue to DCF, which in turn left the decision to the children's therapeutic providers. This, he asserts, was contrary to the Legislature's expressed intent that courts construing the juvenile judicial proceedings statute "recogniz[e] the importance of positive parent-child relationships to the well-being and development of children." Id. § 5101(a)(5).

We agree that there is no indication that the court made an express finding that the limitations imposed on father's contact were in the children's best interests. But, as of September 2023, the parties indicated that they had agreed to a contact schedule during the team meeting ordered by the court, and father indicated no disagreement with the agreed conditions. On the other hand, it does not appear that the court ever squarely addressed father's December 2023 and January 2024 motions to enforce and modify parent-child contact.

This oversight is best understood in the unique procedural context of this case. The record reflects that the court made numerous efforts to address the issue of parent-child contact, and that its plans for the use of hearing time were frequently stymied by father's behavior, including being late to hearings, interrupting court proceedings, and leaving hearings early. Under the statute, the court must hold a disposition hearing no later than thirty-five days after finding that a child is CHINS, though it may—as it did here—schedule a further hearing to obtain information necessary for the appropriate disposition of the case. Id. §§ 5317(a), (e). The court's comments indicate that its efforts to focus the parties' attention on issues relevant to disposition arose from concerns about the length of time that had elapsed without completion of the disposition.

6

While it is unfortunate that the court did not rule on father's enforcement motions, the error was harmless. In re B.C., 2013 VT 58, ¶ 18, 194 Vt. 391 (holding that delay of over year between total suspension of parent-child contact, including court's failure to hold evidentiary hearing or make findings on issue before disposition order, even if erroneous, was harmless error); In re R.W., 2011 VT 124, ¶ 17, 191 Vt. 108 (explaining under harmless-error standard, error warrants reversal only if substantial right of the party is affected). Father does not challenge the court's factual findings, which included that he had engaged in domestic violence impacting his relationship with the children, the children were negatively affected by visits with father, and it was in the children's best interests that father's contact be supervised until he completed the recommended domestic-violence programming. From the beginning of the case, it was clear that DCF wanted father to participate in this programming before having unsupervised visits, and father made it equally clear that he was unwilling to do so voluntarily. As a result, it is apparent that if the court had more directly addressed the question of parent-child contact prior to the disposition order, it would not have led to a different result.

Finally, we turn to father's argument that the court erred in discharging custody to mother where he did not have an adequate opportunity to demonstrate his parenting ability. We review the juvenile court's disposition order for an abuse of discretion. In re J.D., 165 Vt. 440, 444 (1996). We will not disturb its findings unless clearly erroneous and will uphold its conclusions where reasonably supported by those findings. In re K.F., 2004 VT 40, ¶ 8, 176 Vt. 636 (mem.). Applying this standard, there was no abuse of discretion. "At disposition, the court shall make such orders related to legal custody for a child who has been found to be in need of care and supervision as the court determines are in the best interests of the child," including an order "returning legal custody to the custodial parent." 33 V.S.A. § 5318(a)(1). Father had the opportunity to increase his contact with the children by engaging with the recommended domestic-violence programming, but he chose not to do so. In considering the appropriate disposition, the court appropriately focused its analysis on the children's best interests and concluded that they would be ill-served by holding the case open to see whether father would at some point participate in that programming where mother had completed all her action steps prior to the adoption of any disposition case plan and was fully prepared to assume unconditional custody. The court's unchallenged findings supported this conclusion.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Karen R. Carroll, Associate Justice

_____
William D. Cohen, Associate Justice