Filed 08/25/25

| VERMONT SUPERIOR COURT | | CIVIL DIVISION |
|---|---|---|
| Orange Unit |  | Case No. 24-CV-01133 |
| 5 Court Street | | |
| Chelsea VT  05038 | | |
| 802-685-4610 | | |
| www.vermontjudiciary.org | | |

**Tabitha Dunbar v. Ian Hathaway**

# ENTRY REGARDING MOTION

Title:       Motion to Compel D's Motion to Compel Mental Evaluation (Motion: 2)

Filer:       Susan J. Flynn; Ian D. Hathaway

Filed Date:  March 04, 2025

The motion is GRANTED IN PART.

The present motion, filed by Defendant Ian Hathaway, seeks to compel Plaintiff Tabitha Dunbar's mental examination under Vermont Rule of Civil Procedure 35 by Dr. Elizabeth Leritz, a license neuropsychologist.  Plaintiff originally opposed the motion based on fears and concerns that taking such an exam without accommodations would cause a hardship.

As an initial threshold matter, the Court finds that Defendant has established good cause for conducting the examination under Rule 35.  *In re B.C.*, 2013 VT 58, ¶ 20 (noting that mental examinations pursuant to Rule 35 are not to be granted as a matter of right but require a showing of good cause) (quoting *In re C.E.E.*, 139 Vt.

65, 68 (1980)). The facts of the case indicate that Plaintiff is claiming mental injuries derived from the concussion that she received in the collision. These injuries include brain fog, memory loss, and inability to concentrate. These ailments can be both reasonable resulting injuries from concussion and also generalized conditions that affect a wide variety of individuals with non-physical causative sources. The Court finds that Defendant contests both the nature and the extent of these injuries and that the examination sought is intended to quantify the extent and nature of Plaintiff's conditions. For these reasons, the Court will Order Plaintiff to be examined by Defendant's expert.

As another threshold matter, the Court finds that the testing proposed by Dr. Leritz meets the basic standards of admissibility under the *Daubert* test. *985 Associates LTD v. Daewoo Electronics America Inc.*, 2008 VT 14, ¶ ¶ 10, 16. First, the Court finds that neuropsychology is not a junk science. Second, the Court finds that the key components of Dr. Leritz's exams are not only consistent with accepted neuropsychological practices, but they allow for review and replication to permit the adversarial process to scrutinize and draw out deficiencies. Id. at ¶ 16. First, the testing protocol is highly stylized and permits a similarly situated expert to identify the questions to be used, to evaluate the responses recorded, to check the scoring given, and to access the same normative data that the examiner uses to build her opinion. In short, Plaintiff's expert can identify all of the key components to the

exam and can either review or replicate the process to draw out any errors or raise meaningful objections to the conclusions through cross examination. Id. For these reasons, the Court's initial concerns of admissibility have been addressed, and the Court finds no basis to exclude such an exam under a threshold *Daubert* analysis at least in how the testing is proposed to be conducted.

The crux of this motion, however, comes down to the manner in which Dr. Leritz should conduct the examination within the context of Rule 35 and contested litigation. Here the parties diverge and have dug into their respective positions. Dr. Leritz contends through affidavits, testimony, and exhibits that it is standard practice for a neuropsychologist to conduct their exams in the following manner. First, the examiner interviews the subject in an informal manner. This interview, which is not scripted, can be recorded and is effectively an introduction and warm-up session to the actual tests. After the initial interview, any recording devices are turned off and any party other than test administrator and test taker are dismissed. The examiner then begins to administer a battery of test questions. The questions are pre-planned and come from standardized sets that are available to any psychologist but are not available to the public or anyone unwilling to abide by the confidentiality provisions with which the questions are sold. The examiner seeks to administer the tests in a neutral setting to create a consistency with prior examinations and control for any possible environmental variables. For these

reasons, Dr. Leritz insists that this process is never recorded, and it is intended to be a closed session. After the test, the examiner takes the results and scores the answers. She then interprets the scores based on collected normative data sets for similarly situated individuals. From this, she derives her conclusions, which are laid out in a final report and findings.

Plaintiff does not object to the testing itself, but she objects to the confidentiality imposed on the testing process. Particularly, Plaintiff raised concerns that the administration of the exam without a recording or third-party witness would be unfair in that Plaintiff, who has memory issues, would not be able to recall all of the details of the examination, leaving her without the information as to what tests occurred, what responses she gave, and whether the results are accurate. She believes that this would be true even if she is assisted by her own expert. Plaintiff also presented the testimony of Dr. Richard Frederick, a forensic psychologist, who disputed Dr. Leritz's statements regarding the need for confidentiality and the impact cameras would have on the testing process.

Based on their testimony, the Court is aware that Dr. Leritz and Dr. Frederick represent two ends of a dialogue that is occurring within the professional psychological world around the impacts of recording devices and third-party scrutiny or process. Dr. Leritz, the neuropsychologist represents the view of the "guild" of neuropsychologists as well as the traditional belief that even a passive and silent

recording device alters a subjects performance because they are effectively answering to the examiner and for the camera. Dr. Frederick, the forensic psychologist, finds that the data does not support these fears and represents that the benefits of a transparent examination outweigh the potential negatives.

The Court finds that both experts were credible in their position. Even a neutral camera has an impact on a person's behavior as long as they remain aware that it is filming. The Court understands the concerns that a recording device could cause a test subject to emote or justify for the benefit of the recording where such behavior would not occur in an unrecorded session. At the same time, the Court recognizes that we live in surveilled society where being recorded is a part of daily life. Security camera footage shows that people do not behave differently simply because there are cameras around. It is not, however, the role of the Court to resolve this phenomenological conundrum. Nor is it necessary to set reasonable expectations and boundaries for the mental examination that the defense has proposed.

While it might be ideal to have some record of the testing, it is not necessary. The test itself is a standardized test, and it is evaluated against normative data. Dr. Leritz has portrayed the testing process as a highly regulated affair, which means that it should be predictable how the testing will occur. Plaintiff will be present for the examination, and if there are any issues with the administration, she can either

be prepared in advance about how to spot them, or she can be de-briefed immediately thereafter. In either case, the issues can be examined by Plaintiff's expert and raised to the court through motion or cross examination.

The testing process itself is only a part of the evaluation. Plaintiff's responses to the questions, both verbal and non-verbal, are recorded and then evaluated against normative data. Raw footage of the examination is unlikely to be admissible under these circumstances as it is effectively work product. While video might provide definitive proof of misconduct, the court is not persuaded that (1) such misconduct is as frequent as Dr. Frederick portrays it; or (2) that such video proof would be as dispositive as Plaintiff asserts. During the hearing, as an example, Dr. Frederick offered criticism of what he opined were improper questioning techniques by Dr. Leritz done in a prior examination. Dr. Leritz credibly responded that the images in question were part of specific exam dictated by another court and were not intended to be a neuropsychological exam. In this respect, Dr. Frederick's criticisms were well-founded, Dr. Leritz did not follow her own guidelines and practices in the video. Yet, to an equal extent, they missed the mark. The questions were off because the process was not a neuropsychological exam and was not being conducted to this standard. Yet, what strikes the Court most about this dispute is that the raw footage was not dispositive. Rather, it was the parties' review, context, and interpretations that gave the footage meaning.

The Court is persuaded that video footage in this respect is unlikely to help the jury decide whether the expert opinions are more or less credible. Its primary function would be to assist a counter-expert in critiquing the exam, but it is not the counter-experts only or even primary tool. As noted by defense counsel, Plaintiff is free to conduct its own neuropsychological exam, and it is free to use Plaintiff's impressions and memories of the event as the basis for any review and critique.

This leaves the Court with a balancing question. Does the daylight Plaintiff seeks to throw onto the examination process outweigh the potential impacts to the process? The Court after reviewing the filings finds that it does not. Defense has raised credible concerns about what a recording would do to the process, whether it would create an inadvertent disclosure of confidential information, and whether it would nullify the entire test. Against these concerns, Plaintiff's valid need for information to scrutinize and evaluate the test for adversarial purposes does not measure up. Plaintiff has other options to collect information and to review the result. Moreover, the original concerns of Plaintiff's comfort and care can be addressed in other ways that will protect the integrity of the examination but permit Plaintiff the necessary breaks she may require.

Therefore, the Court will allow Dr. Leritz to conduct the neuropsychological exam under the following conditions:

1) either party may record the pre-testing interview.

2) Ms. Dunbar may have a third-party companion in the room during the interview, but the companion shall sit outside of any testing room and shall not be present for any testing.

3) Dr. Leritz shall disclose what testing question set she used in a manner that Dr. Frederick or any expert Plaintiff retains shall be able to identify what questions were asked.

4) Dr. Leritz shall share her recorded responses from Plaintiff with Plaintiff's expert along with information regarding the normative data sets she used to form her opinion.

5) Ms. Dunbar shall be able to take reasonable breaks during the testing that do not interrupt the testing protocols but provide her with the break opportunities she may find necessary. During such breaks, she may seek refreshment and may speak with her companion as necessary.

The testing shall occur in the next 60 days, unless the parties jointly agree to a different date. The Motion to compel is **Granted.**

**So Ordered.**

Electronically signed on 8/24/2025 2:12 PM pursuant to V.R.E.F. 9(d)

24-CV-01133 Tabitha Dunbar v. Ian Hathaway

_____
Daniel Richardson
Superior Court Judge