### In re B.M., Juvenile

[682 A.2d 477]

No. 95-087

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed July 5, 1996

Motion for Reargument Denied July 26, 1996

---

*Robert Appel*, Defender General, and *William A. Nelson*, Appellate Attorney, Montpelier, for Appellant Father.

*Jeffrey L. Amestoy*, Attorney General, Montpelier, and *Barbara L. Crippen*, Assistant Attorney General, Waterbury, for Appellee Department of Social and Rehabilitation Services.

*Charles S. Martin* of *Martin and Paolini*, Barre, for Appellee Juvenile.

**Johnson, J.** This termination-of-parental-rights case poses painfully difficult questions. Father, who did not play a significant care-

taking role in this child's early life, has overcome substance abuse problems and stabilized his life, and now believes he can act as a parent to his young daughter. The child, now almost nine years old, has been in the custody of the Department of Social and Rehabilitation Services (SRS) for over five years, living with the same foster parents for that time. In such cases, there are no good solutions, but this case is particularly troubling given the prolonged uncertainty that this child has endured. Father raises salient criticisms of the family court's decision, which we address and to some extent accept. Nonetheless, we affirm the court's order terminating father's residual parental rights.[1]

## I.

SRS first became involved with this family in the summer of 1990, when the child was almost three. Her mother reported to SRS that the child had been abused by a family friend. SRS opened a voluntary protective services case because of concerns that the child was not adequately supervised and that mother had problems with substance abuse. For the next few months, an SRS social worker made monthly home visits and met with mother. Father was sometimes present during these visits, but made no effort to talk with the social worker and was not identified as a primary caregiver for the child. During this time, father was on probation following a burglary conviction, and repeatedly tested positive for cocaine. He was also charged with assaulting mother, but the charges were dropped when the state's attorney was unable to subpoena mother to testify.

In April 1991, the situation became critical. A police officer was called to mother's home on a charge of unlawful trespass, and found father there visibly intoxicated. Mother was also intoxicated, and the police confiscated evidence of cocaine use. Neighbors reported that the parents were constantly drinking and abusing drugs, and that the child was left unsupervised. The next morning, the social worker and a police detective visited the home and found it in total disarray, with trash, garbage, and beer cans strewn throughout the apartment. Both parents were visibly hung over, and mother admitted that they had been partying for several days. The child was filthy and hungry. She was taken into protective custody, and an emergency detention order was issued the same day.

---

[1] The court also terminated the parental rights of mother, who has not appealed.

The child was found to be in need of supervision by agreement of the parties. Neither parent appeared for a scheduled disposition hearing. The first disposition report prepared by SRS recommended substance abuse treatment for both parents, participation in a parent education program, and father's successful completion of probation. At father's request, the report was amended to focus more on reunification with him, because of mother's lack of cooperation. The primary goal set for both parents was attaining sobriety. The plan anticipated reunification by mid-November of 1991.

At that time father was not complying with either his probation requirements or the case plan. He disappeared for a time in September, not showing up for his job, not reporting to his probation officer, not showing up for visits with the child, and not going to his treatment program at the University of Vermont. He later resumed treatment, but continued to test positive for cocaine and was discharged from the program for noncompliance in November 1991. He re-entered the program the next month, again testing positive for cocaine, and no-showed for most of his urine tests in January 1992. Also in January, he was arrested and charged with aggravated assault based on an incident involving mother's new boyfriend. In February, the SRS caseworker decided that the case plan goal should be changed to termination of parental rights because of the child's need for permanence and the parents' failure to engage in treatment. That change was made in April 1992, at the twelve-month plan review.

SRS waited six months, however, to file the petition for termination of parental rights. Father pursued an administrative appeal of the case plan goal but was unsuccessful. The court proceedings were delayed for almost two years due to a number of pretrial motions. The court did not begin hearings on the petition for termination of parental rights until April 1994. The hearings concluded in August 1994, and the court issued its decision five months later.

By the time of the hearings, father had made significant positive changes in his life. He had been sober for over two years, was regularly employed, and had been discharged from drug treatment and from probation. He had married in 1993, and he and his wife were in the process of buying a house. Nonetheless, SRS continued to prosecute the termination-of-parental-rights petition, maintaining that father's improvement had come too late given the child's need for permanency, and that at any rate father was still unable to adequately parent his daughter because of her special needs.

Two procedural issues in this case merit special attention. First, although we draw our description of the facts from the family court's

findings, we are concerned that the court in this difficult and close case chose to adopt SRS's proposed findings essentially verbatim. Even the conclusions of law were altered only slightly from the proposed conclusions submitted by SRS. A court's adoption of a party's proposed findings is not error, and the findings shall not be set aside unless clearly erroneous. See V.R.C.P. 52(a)(2). Nonetheless, this was, in the court's words, a "tough case," one that the court took five months to decide. Under these circumstances, it would have been better for all concerned, including this Court, if the decision below reflected the court's independent evaluation of the case.

The length of time the court took to issue the decision raises the other troubling procedural issue: the unreasonable and unconscionable delay that this child has endured while waiting for a final decision about her future and her relationship with her natural father. The problem began with SRS's inexplicable six-month delay in filing the petition for termination of parental rights, and continued with the numerous pretrial motions that slowed the progress of this case. The five days of hearings were held over a five-month span, and as already mentioned, the court did not issue a decision until another five months had passed. Nor has the appeal progressed as rapidly as possible, because of extensions of time for filing the briefs. Each of the parties contributed to this problem, and the court system must also take its share of the blame. The tragic result, however, is that our decision issues more than five years after this child, then only three, was removed from her home and placed with foster parents. The harm that this child has suffered by remaining in limbo for so many years cannot be undone.

We also recognize that, at this writing, nearly two years have passed since the hearings were held. To some extent, we have assumed that the status quo has continued, specifically that the child still lives with the same foster parents and that father has continued to abstain from drug use. We have no way of knowing what has happened in the past two years, however, and base our decision only on the evidence before the family court.

## II.

Termination of residual parental rights at a modification hearing requires a two-step analysis. *In re M.M.*, 159 Vt. 517, 521, 621 A.2d 1276, 1279 (1993). In order to modify the existing disposition order, the court must first find that "changed circumstances so require in the best interests of the child." 33 V.S.A. § 5532(a).

Modification is warranted where there has been a substantial change in material circumstances, which is "'most often found when the parent's ability to care properly for the child has either stagnated or deteriorated.'" *In re M.M.*, 159 Vt. at 521, 621 A.2d at 1279 (quoting *In re H.A.*, 153 Vt. 504, 515, 572 A.2d 884, 890 (1990)). A finding that a parent has made some progress does not, however, preclude a finding of changed circumstances. *In re A.F.*, 160 Vt. 175, 181-82, 624 A.2d 867, 871 (1993).

■ The court must also determine whether the best interests of the child require termination of all parental rights, in light of the criteria set out in 33 V.S.A. § 5540. The critical factor is whether the natural parent will be able to resume parental duties within a reasonable period of time. *Id.* at 177, 624 A.2d at 869. "The court's conclusion that a parent will be unlikely to resume [his] parental duties must be supported by clear and convincing evidence." *Id.* at 177-78, 624 A.2d at 869.

■ This is a difficult case in many ways, not least because it does not easily fit within our usual framework for analyzing termination-of-parental-rights cases. As one example, the delay between the filing of the petition and the hearings raises the question of how to measure stagnation. There was a lengthy period of stagnation, and even deterioration, in this case. Because of the numerous delays, however, by the time of the hearing father had made significant progress. In deciding whether stagnation has occurred, should the court consider only the period of time before the termination petition was filed, or should it also look at father's overall progress up until the hearing? From the child's perspective, at least, the earlier period of stagnation is not necessarily wiped out by the later improvement. The harm may have been done. Moreover, we recently recognized that where some parental improvement has occurred, the "question is whether the improvement substantially conformed with the expectations at the time of the CHINS adjudication and with SRS's case plan." *In re D.B.*, 161 Vt. 217, 220, 635 A.2d 1207, 1210 (1993). Here, although father's progress is substantial, it has come much later than anticipated.

Regardless, the key question in this case, and the only argument raised by father, is whether the court's conclusion that father would be unable to resume his parental duties in a reasonable time was supported by clear and convincing evidence. The court essentially gave two separate grounds for this conclusion, emphasizing father's

past failure to progress during the first year following the CHINS determination, but also finding, based on expert testimony, that father was presently incapable of parenting the child. Father challenges both grounds.

First, the court stated that, although father made substantial progress towards reunification, his progress did not occur within a reasonable time for the child's needs. Specifically, father did not make substantial progress during the twelve-month period before SRS changed the case plan goal to termination. Father maintains that under this approach, any progress that he made after the case plan goal was changed to termination, and any progress he might make in the future, is irrelevant because his fate was sealed before the termination petition was even filed. He argues that the court erred by focusing on the past, because the statute requires the court to consider whether the natural parent *"will* be able to resume his parental duties within a reasonable period of time." 33 V.S.A. § 5540(3) (emphasis added).

We agree with father that the inquiry required by § 5540(3), which we have repeatedly emphasized as the most critical factor in a termination-of-parental-rights case, is forward-looking. See *In re J. & J.W.*, 134 Vt. 480, 484, 365 A.2d 521, 524 (1976) (petition for modification and termination of parental rights must be based on deterioration or "stagnation coupled with a *prospective* inability for improvement") (emphasis added). Although a "reasonable period of time" must be measured in terms of the child's needs, the court cannot beg the question by concluding that a reasonable period of time ended years before the termination-of-parental-rights hearing. The court must consider the parent's prospective ability to parent the child.

This does not mean, however, that past events are not relevant to whether the parent can resume parental duties. In this case, for example, the most important fact may be that the child does not have and has never had a significant relationship or bond with her father. He was not the child's primary caretaker before she was removed from the home. Father was incarcerated several times while the child was young, including a ten-month period when the child was two years old. The child also witnessed domestic violence between her parents, and that experience threatens her perception of safety when her father is present. Past circumstances that have affected the parent-child relationship will of course be relevant to whether a parent can resume a caregiving role. The focus of the termination

hearing, however, should be the future of the parent-child relationship.

Despite its conclusion that a reasonable period of time had already passed, the court did turn its attention to father's present ability to resume his parental responsibilities. Unfortunately, in concluding that father's parenting skills are inadequate and that he will not be able to properly care for the child in the immediate or foreseeable future, the court relied heavily on the results of psychological testing. The expert witness who evaluated father, Dr. Nash, administered two tests, the Minnesota Multiphasic Personality Inventory (MMPI) and the Parenting Awareness Skills Survey (PASS). Based on these tests, Nash testified that father had a "pervasive lack of empathy" and an egocentric approach to parenting. Nash testified, and the court found, that if the child were returned to father's custody, he would likely "react to her in ways which meet his needs rather than hers . . . with damaging consequences [to the child]." Father characterizes the test results as the "*only* evidence" of inadequate parenting skills, and objects to the use of psychological tests as the basis for an order terminating parental rights.[2]

■ We agree with father that the court's emphasis on psychological testing is disturbing. Such tests, when relied on by expert witnesses, may have a small place in the overall evaluation of a person's parenting ability. Parents facing the loss of parental rights, however, must be judged on their conduct, not on their test-taking skills or psychological traits. In this case, for example, the court first labeled father, based on his MMPI results, as "a person with hedonistic, narcissistic and impulsive tendencies and over controlled hostilities." The court then linked these personality traits to likely behaviors, noting that "[s]uch persons typically seek immediate gratification, blame others for their own problems, and manipulate others for their own desires, experiencing little guilt about the effects of their actions on others." Finally, the court closed the door on possible changes or improvements, finding that "these are consistent and pervasive traits which no form of intervention will change."

---

[2] SRS argues that father did not object to the admission of the test results at trial, and that this Court should therefore not address the issue absent "glaring error." See *In re A.C.*, 144 Vt. 37, 39 n.2, 470 A.2d 1191, 1192 n.2 (1984). We agree with father that SRS has mischaracterized his argument. Father does not claim that the test results were inadmissible or invalid for all purposes. Rather, father argues that the evidence as a whole, including the psychological testing, was insufficient to support the court's decision.

Although recognizing that parenting skills can be learned, the court nonetheless found that "in times of stress [father] will fall back on his inherent personality traits."

The court was apparently further persuaded by the correlation of father's test results, finding that the "PASS results [and] MMPI scores reinforce each other and show a pervasive lack of empathy." We are unable to share the court's confidence in this fact, as the findings and the record lack a meaningful explanation of the purposes, appropriate uses, or scoring methods for these tests. For example, expert testimony and the court's findings emphasize that father's PASS results were "clinically low." According to the PASS manual, however, the PASS is scored subjectively, by the individual evaluator. B. Bricklin, *Parent Awareness Skills Survey Manual* 6 (1990). There is no evidence in the record to explain the expert's scoring decisions or standard for comparison, or to justify reliance on the test score in a proceeding to terminate parental rights.[3]

The "awesome power" of the State to terminate parental rights, *In re J.M.*, 131 Vt. 604, 607, 313 A.2d 30, 31 (1973), cannot be exercised on the basis of "inherent personality traits" revealed by psychological tests. Whether the tests are accurate enough for such use is an open question; any such test raises concerns of cultural, educational, and socioeconomic bias. Moreover, characterizing individuals as bad parents based on "pervasive traits which no form of intervention will change" is inconsistent with the goal of fostering parental improvement. That kind of reasoning suggests that SRS should simply administer these tests immediately after a child is removed from the home, and pursue reunification only with those parents who test well.

The Oregon Court of Appeals, in refusing to terminate a mother's parental rights based on MMPI scores that correlated with parental abuse, stated the obvious: "The existence of a prognosis that a person will, at some time in the future, turn out to be a poor parent should not, standing alone, serve as the basis for terminating parental

---

[3] SRS filed the manual with the Court as an appendix. The manual provides little help in understanding the test scores, however, because the scoring is subjective and because the scores given for father, father's wife, and the foster parents do not correspond to the suggested scoring scales. According to the manual, responses to each of the eighteen questions should be graded "2," "1," or "0." The manual notes that the test was previously scored on a scale of one to ten for each question. Neither scale matches the given test scores of 32.7 for father, 11.7 for father's wife, 65 for the foster father and 81.5 for the foster mother. Father's wife's score would be impossible on the older scale, and the foster parents' scores are both too high for the new scale. B. Bricklin, *Parent Awareness Skills Survey Manual* 11 (1990) & Supp. I at 2 (1991).

rights." *In re Wyatt*, 579 P.2d 889, 891 (Or. Ct. App. 1978) (en banc). In this case there are other, valid reasons for terminating father's parental rights. We are nonetheless deeply concerned by SRS's emphasis on psychological testing at trial, and by the willingness of the court to base its findings and conclusions on evidence of such questionable value. We therefore take this opportunity to unambiguously reject the use of psychological testing as the sole basis for an order terminating parental rights.

## III.

Although we agree with father's criticisms of the court's decision, we cannot accept his statement that the test scores are the *"only evidence"* supporting the order terminating his parental rights. The problem in this case is not a lack of evidence but an improper emphasis. We will not reverse the order terminating father's parental rights simply because some of the court's findings are erroneous; rather, we must "determine 'whether the findings that were supported by the evidence were sufficient to support the court's decision.'" *In re B.M.*, 165 Vt. 194, 205, 679 A.2d 891, 898 (1996) (quoting *In re C.M.*, 157 Vt. 100, 103, 595 A.2d 293, 294 (1991)). If the court has made findings sufficient to support its decision, and those findings are supported by the record, we will affirm. *Id.* We conclude that in this case there are adequate findings to sustain the decision.

SRS presented substantial evidence concerning the absence of a meaningful connection between the child and her father. The child's therapist, Dr. DiBlasio, testified that although the child has a strong bond with her biological mother, she does not have a bond with father. This lack of a relationship indicates that father was not a primary caregiver for the child. Other evidence supports this conclusion. The early years of a child's life are critical to forming a parent-child bond, and because of his incarcerations, father was absent for long periods of time when the child was young. Moreover, when SRS first became involved with this family before the child was removed from the home, father did not speak to the social worker or display any interest in the child's situation. In therapy, the child often talks about her foster parents and makes references to her mother, but she does not talk about father or spontaneously mention her visits with father and his wife.

The evidence also indicates that the child does not feel safe in father's presence and that the possibility of reunification with father has increased her feelings of anxiety. She described incidents of

domestic violence to her therapist, Dr. DiBlasio, including one occasion when her mother was hit by father and then asked the child to call 911. During her therapy sessions, the child frequently acted out themes of parental violence and substance abuse, specifically expressing concern for babies at risk of harm from an unidentified man. The references to violence stopped for some time, but began again soon after the court increased visitation pending the resolution of the case. DiBlasio testified, and the court found, that the change in visitation increased the child's anxiety, and that the child's memory of early childhood incidents of violence affected her perception of safety in father's presence.

The child's behavior reinforces this conclusion. When father and his wife talked to the child about fixing up a room for her in their house, she began having nightmares, enuresis and other somatic complaints on visit days. She also became very clingy with her foster parents, and began to make excuses and tell lies to avoid speaking to father or his wife on the telephone. References by father and members of his family to the possibility that she will "come home" to live with father have been very upsetting for the child.

If this decision were based on a simple weighing of the factors in 33 V.S.A. § 5540 to determine the best interests of the child, the result would be easy to reach. The evidence showed that the child has a strong and positive relationship with her foster parents and foster brother, and is well-adjusted in that community. Her relationship with her father is weak and fraught with anxiety, and despite his obvious concern and love for her, father has not played a constructive role in the child's life. Consistent with constitutional requirements, however, we have interpreted this statute to require proof, by clear and convincing evidence, that the natural parent will not be able to resume parental duties in a reasonable period of time. *In re M.M.*, 159 Vt. at 523, 621 A.2d at 1280; see *In re A.D.*, 143 Vt. 432, 435, 467 A.2d 121, 123 (1983) (noting that *Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982), requires use of clear and convincing evidence standard in cases involving permanent termination of parental rights).

The question of whether this stringent standard has been met cannot readily be answered by reference to our precedents. We have at times downplayed the importance of a "psychological parent" relationship, and emphasized more concrete factors, like regular participation in visitation and stable employment and living situations. *In re J. & J.W.*, 134 Vt. at 484-85, 365 A.2d at 524. But we have also upheld a decision terminating a mother's parental rights where

the court found that the mother could not meet the child's emotional needs, and that the child no longer accepted the biological mother as her parent. *In re J.R.*, 153 Vt. 85, 100-01, 570 A.2d 154, 161-62 (1989). And we have recognized that "[p]ublic policy . . . does not dictate that the parent-child bond be maintained regardless of the cost to the child." *In re M.B.*, 162 Vt. 229, 238, 647 A.2d 1001, 1006 (1994). In this case, where father has never had a meaningful bond with the child and the child displays great anxiety at the possibility of reunification, the court correctly concluded that father would not be able to resume his parental duties in a reasonable period of time.

Nor is our conclusion inconsistent with *In re J. & J.W.*, where we held that the "loss of the psychological parent relationship between natural parent and child by itself does not establish a substantial change in material circumstances." 134 Vt. at 484, 365 A.2d at 524. This is not a case in which the State disrupted a parent-child relationship by removing the child from the home, and then argued that the subsequent weakening of the parent-child bond should be grounds for termination. Here, when SRS removed the child from the home, father and child did not have a significant relationship. The child's move into foster care was not responsible for weakening the parent-child bond, because that bond had never been formed.

We are impressed, as was the family court, with father's substantial personal achievement in improving his own life. But this child cannot be treated as a prize for good behavior. The focus of this case is not merely father's present circumstances, but his present ability to act as this child's parent. Father's potential to adequately fulfill that role has been drastically reduced by his lack of a relationship with his daughter and his failure to play a caregiving role in her early life. His progress has come too late to redress these past shortcomings. We agree with the family court that the best interests of the child favor termination of father's residual parental rights.

*Affirmed.*