*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

**ENTRY ORDER**

SUPREME COURT DOCKET NO. 2011-209

NOVEMBER TERM, 2011

| | |
|---|---|
| In re A.C., Juvenile | APPEALED FROM:<br><br>Superior Court, Rutland Unit,<br>Family Division<br><br>DOCKET NO. 49-5-09 Rdjv<br><br>Trial Judge: Cortland Corsones |

In the above-entitled cause, the Clerk will enter:

Mother appeals from the superior court's order terminating her parental rights in daughter A.C. She argues that the court erred in concluding that she could not parent A.C. within a reasonable period of time. We affirm.

A.C. was born in April 2008. In May 2009, she was taken into temporary custody of the Department for Children and Families (DCF) after mother suffered a mental health crisis and was unable to care for her. The parties stipulated that A.C. was a child in need of care or supervision (CHINS) in July 2009, and the court so found. In May 2010, DCF moved to terminate mother's parental rights. Following a three-day hearing, the court granted DCF's request.

The court found as follows. Mother is not employed; she does not drive and does not have a car. Mother was abused and neglected by her own parents. She was placed in DCF custody at age four and adopted by her foster parents shortly thereafter. Mother became unmanageable and was returned to DCF custody at age fourteen. She was in and out of residential treatment facilities, and lived with another foster family until she turned eighteen. Mother did not graduate from high school. During her high school years, she regularly smoked pot, consumed alcohol, ingested pills and cocaine, and occasionally used drugs intravenously. She also attempted suicide through cutting and overdosing. Mother has had a series of tumultuous and dysfunctional relationships with men. Mother was twenty years old when A.C. was born.

As noted above, mother had a serious mental breakdown in May 2009. On the day in question, a police officer observed mother's boyfriend chasing mother down the street. Mother was hiding under a porch. She was shaking and would not come out. Mother also had a knife, which the officer took away from her. Mother's boyfriend said that mother had given A.C. to him with a note saying that he could have custody. He stated that he was not the father of the child and would not take custody of her. A.C. was taken into DCF custody and placed with mother's adoptive parents.

DCF moved to terminate mother's rights in May 2010. At the termination hearing, a mental health evaluation of mother, which had been conducted in April 2009, was entered into

evidence. The evaluator made several recommendations, including that mother engage in psychotherapy such as Dialectical Behavior Therapy (DBT). DCF identified a DBT therapist in the fall of 2009, but it took mother until March 2010 to set up her first appointment with the therapist. Some of the delay was due to mother and some to issues beyond her control. The DBT therapist's working diagnosis of mother was borderline personality disorder. The therapist described mother's progress as good. According to the court, the therapist estimated that mother had approximately three months to go to complete the first phase of the therapy, and that mother may be looking thereafter at another one-and-a-half to two years of further DBT.

The court found that during the time that A.C. was in custody, mother continued to have relationship problems, including domestic violence, and she continued to live a chaotic lifestyle. Mother became homeless for a time. In January 2011, the police found mother at her former boyfriend's house banging on the windows and attempting to enter the home. Mother was hiding in a bush when she was found by police, and she was highly intoxicated. She was taken to Grace House, but had to be removed because she was uncooperative. Mother was then moved to a correctional center. In March 2011, mother was found hiding in a closet in her apartment. On the same date, police were contacted after mother refused to allow her landlord into her apartment to check a water leak. Eventually, the landlord's husband found a rubber bin full of water and clothes in mother's apartment that appeared to be leaking. Mother stated that she did her laundry in that bin and that it had been full of water for three days. A dispute between mother and the landlord ensued, which involved mother repeatedly contacting the police.

A family forensic evaluation was performed by Dr. John Donnelly. Dr. Donnelly concluded that mother's prognosis for independently caring for, supporting, and raising A.C. remained between poor and guarded, at best. Dr. Donnelly opined that mother was at least three to five years away from being able to successfully parent A.C. He also expressed concern about the effect of a failed attempt at reunification upon A.C.'s permanency needs. Dr. Donnelly found that in many ways, mother's maturity and emotional development were at an arrested stage, and he was very concerned about her general instability and overall diminished psychological functioning. Dr. Donnelly supported termination of mother's rights. The child's guardian ad litem also testified that, based on the evidence presented, she believed mother was several years away from being able to effectively parent A.C., which was too long to wait from A.C.'s perspective. In the GAL's opinion, terminating mother's rights was in the child's best interests.

The court found that mother had been consistent in visiting A.C. while she was in custody. Nonetheless, supervised visitation was still required after two years. The court found that mother's main visitation issue continued to be her relationships and her inability to understand how they impacted, or could impact, A.C. Mother had to be reminded many times not to bring her boyfriends to visits. In January 2010, mother indicated that she had been assaulted and raped by her ex-boyfriend, against whom she had a restraining order. Mother did not seek medical care or file a report with police, however, although DCF strongly advised her to do so. Mother continued to remain in contact with this individual, and this individual showed up at mother's first unsupervised visit with A.C., which placed A.C. in danger. Finally, the court found that A.C. had been in the same home since she came into custody. She had a close loving relationship with her foster parents, and had done very well in their care. The court found that A.C. needed permanence, including a safe, stable living environment.

Based on these and numerous other findings, the court concluded that mother had stagnated in her ability to parent A.C., and that termination was in the child's best interests. The court reiterated that even after two years of supervised parent-child contact, A.C. still could not

2

safely have unsupervised contact with mother. Dr. Donnelly had opined that mother was at least three to five years away, and the court found his opinion supported by the evidence. While mother had made some improvements in her life, her life continued to be chaotic and unstable due to her mental health problems, and in all likelihood, due to substance abuse issues. The court noted that mother's own counselor testified that mother should have another one-and-a-half to two years of DBT counseling. It explained that mother suffered from chronic mental health disorders that were extremely difficult to overcome and that resulted in her being unable to safely care for A.C. Mother's mental health issues continued to significantly manifest themselves, even up to the time near to the termination hearing, and one of these incidents was very similar to the incident that had originally brought A.C. into DCF custody. The court found that these more recent incidences demonstrated that mother could not safely care for A.C. In reaching its conclusion, the court considered the statutory best-interest factors and found that they weighed in favor of termination. It thus terminated mother's rights, and this appeal followed.

Mother argues that the court erred in concluding that she would not be able to resume parenting within a reasonable period of time. She asserts that there is no support for the propositions that A.C. needs permanency or that mother needs long-term counseling. Mother states that while children at A.C.'s age might generally have a pressing need for permanency, it is not clear that A.C. does given that she has been in a safe stable foster home since 2009. Mother also argues that the existence of a mother-child bond weighs against termination. As to counseling, mother asserts that the court misconstrued the testimony of her DBT counselor that mother should have another one-and-a-half to two years of DBT counseling. Finally, mother suggests that DCF did not make reasonable efforts to reunite her with A.C. because a comprehensive evaluation for substance abuse or dependence was not completed.

We find these arguments without merit. When the termination of parental rights is sought, the court first considers whether there has been a substantial change in material circumstances, and second, whether termination of parental rights is in the child's best interests. In re B.W., 162 Vt. 287, 291 (1994); see 33 V.S.A. §§ 5113-5114. A substantial change in material circumstances is most often found when "the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." In re B.W., 162 Vt. at 291 (quotation omitted). To determine if termination of parental rights is in a child's best interests, the court must consider four statutory factors. See 33 V.S.A. § 5114. The most important factor is the likelihood that the natural parent will be able to resume his or her parental duties within a reasonable period of time. See In re B.M., 165 Vt. 331, 336 (1996). As long as the court applied the proper standard, we will not disturb its findings on appeal unless they are clearly erroneous; we will affirm its conclusions if they are supported by the findings. In re G.S., 153 Vt. 651, 652 (1990) (mem.).

The court applied the appropriate statutory standard, and its decision is supported by the evidence. The question before the court was not whether A.C. would be harmed by remaining in foster care, but, as relevant here, whether mother could parent A.C. within a reasonable period of time. There was ample evidence to support the court's finding that A.C. needed permanence and stability, and that she could not wait several years to see if mother's parenting would improve. As set forth above, A.C. came into DCF custody when she was one year old and had been in DCF custody for two years at the time of the court's order. The court properly considered the child's age and the length of time in DCF custody in evaluating whether a reasonable period of time had elapsed from the perspective of the child. The court also considered the existence of a mother-child bond, but determined that its existence was outweighed by the other statutory best-interest factors. As we have often repeated, "[o]ur role is not to second-guess the family court or

to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating mother's parental rights." In re S.B., 174 Vt. 427, 429 (2002) (mem.). Mother fails to show an abuse of discretion here.

Mother's remaining claims of error are equally without merit. As recounted above, the court credited Dr. Donnelly's opinion that mother was many years away from being able to successfully parent A.C. Mother does not challenge this finding, which is supported by the record and which supports the court's conclusion. Any error in the court's statement about the length of DBT therapy that mother might need is harmless. We note, however, that while the DBT therapist did not directly testify that mother needed another year-and-a-half to two years of DBT, she did testify that, generally, a patient engages in DBT therapy for a year, and possibly a year-and-a-half to two years. She also stated that if a patient continued to engage in the same type of behavior notwithstanding DBT therapy, the patient could choose to participate in another year of DBT therapy, and could then switch to "depth work" that might take the rest of the patient's lifetime. As set forth above, mother continued to struggle with mental health issues and engage in behavior similar to that which brought A.C. into custody. Finally, while the court noted that neither mother nor DCF had taken steps to secure a substance abuse evaluation, it did not base its decision regarding mother's ability to parent on any substance abuse issues that mother might have. Rather, as set forth above, it concluded that mother had demonstrated an ongoing inability to provide a stable, secure, and nurturing environment for A.C. based on her chronic mental health issues and her relationships with men who presented a danger to A.C. We reject mother's suggestion that DCF is somehow responsible for her parental shortcomings. The record amply supports the court's decision that mother cannot parent A.C. within a reasonable period of time, and that termination of mother's rights is in A.C.'s best interests.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
John A. Dooley, Associate Justice

_____
Brian L. Burgess, Associate Justice

4