*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2014-034

MAY TERM, 2014

| | |
|---|---|
| In re R.M., R-C.M. and C.M., Juveniles | } APPEALED FROM: |
| | } |
| | } Superior Court, Washington Unit, |
| | } Family Division |
| | } |
| | } |
| | } DOCKET NOS. 178-10-12 , 179-10-12, |
| |        & 180-10 12 Wnjv |

Trial Judge: Thomas J. Devine

In the above-entitled cause, the Clerk will enter:

Mother appeals from the termination of her residual parental rights in R.M., C.M., and R.-C.M. She argues that the court did not adequately assess R.-C.M.'s best interests. We affirm.

R.M. was born in April 1997; C.M. in January 1999; and R.-C.M. in May 2002. In March 2009, the Department for Children and Families (DCF) filed petitions alleging that the children were in need of care or supervision (CHINS) based on habitual truancy. The case was put on inactive status because mother and the children, who had left the state, could not be found. In September 2011, upon learning that the children were back in Vermont, DCF requested an emergency care order. The court granted its request after a hearing and placed the children in DCF custody. The court adjudicated the children as CHINS in February 2012 based on the parties' stipulation. Following a contested disposition hearing, the children remained in DCF custody. In January 2013, DCF moved to terminate both parents' residual rights. Following a hearing, the court agreed that termination was in the children's best interests.

The court found as follows. Before the children came into DCF custody, they were subjected to instability, domestic violence, and unsanitary living conditions. The family moved frequently, sometimes staying with friends and relatives, and sometimes staying in homeless shelters. R.M. did not attend school for over two years. Her parents were physically violent with one another. Both parents physically disciplined the children, including slapping the children in the face. Sometime around 2005, mother and father split up and mother's nineteen-year-old boyfriend Pat began living with the family. Pat physically abused the children on a regular basis. The family lived in a filthy home and eventually, they were evicted. In 2009, mother, Pat, and the children moved to New York, and then to Pennsylvania. They lived in Pennsylvania for the next two years until being evicted. The children were sent to live with an aunt and uncle, and when that did not work out, they were sent to live with one of mother's adult sons. The children were then sent to Vermont to stay with another adult son. They were taken into emergency DCF custody in the fall of 2011, not long after their return to Vermont.

DCF's case plan for mother, approved by the court in May 2012, contained four major components: obtain safe and appropriate housing; maintain consistent and successful visitation; engage in successful mental health treatment; and obtain parent education, including instruction on hygiene and cleanliness. The court found that mother failed to comply with these goals. At the time of the termination hearing in January 2014, she remained without her own housing. She was unemployed. She did not make progress in obtaining parent education. She had stopped going to counseling in May 2013. While mother had maintained regular contact with the children while they were in DCF custody, the visits were not successful. The visits were stressful for the older children. While the children loved mother, they had a poor relationship with her. They were confused and angry about what had happened to them and they were not enthusiastic about seeing mother.

Mother believed that she had parented the children appropriately and that there was no reason for DCF to have become involved with the family. She denied subjecting the children to deplorable living conditions. She blamed the truant officer for not ensuring that the children were in school. She acknowledged fighting between her husband and her older sons, but she blamed this on her husband's medication. She agreed that she and Pat had slapped the children in the face, but stated that it did not happen every time and that it was not against the law. The court found mother did not seem to understand that the children had experienced trauma while in her care. After almost three years of case plans and services, mother still lacked insight into the children's needs and the challenges presented for reunification.

The court found that the children had been living together in the same foster home since March 2012. They were doing very well there. The foster parents were committed and experienced and they had enabled the children to make a successful transition to their new home. The children moved as a close-knit team. They were initially suspicious of others, but that outlook was improving. The children had settled into a structured and stable routine and they were attending school regularly. They were an integrated part of the foster family and the foster parents sought to adopt them. The older children testified that they wanted to be adopted by their foster parents. R.C.-M. had a strong bond with her siblings and wanted to be where they were. She spoke positively about her foster home and stated that, if no one's feelings would be hurt, she wanted to stay with her foster parents. The court found that R.-C.M., like the other children, had been through a lot of upheaval, and that she was now in stable environment. It was stressful for her and the other children not to know with certainty where they would be living in the future.

Based on these and numerous other findings, the court concluded that mother had stagnated in her ability to parent and that termination of her rights was in the children's best interests. The court found that all of the statutory best-interest criteria favored termination. The first factor concerns the children's interaction with their natural parents, foster parents, siblings, and others who might significantly affect the children's best interests. The court explained that although the children and mother loved one another, there was stress in mother's relationship with the two older children. R.M.'s negative view of her mother had remained unchanged in over two years. C.M. remained ambivalent about parent-child contact. Of the three children, the court observed that R.-C.M. seemed to have the best relationship with mother. Nonetheless, the court continued, separating the children was not an option. The evidence overwhelmingly showed that the children were closely bonded. When the children entered foster care, they did so as a unit. Initially, the older children exhibited an unhealthy level of anxiety about their siblings. With sustained therapeutic support, that anxiety had lessened. But the children remained deeply committed to one another's safety and well-being. The court found that the children had been in their foster home for almost two years. Over time, they had developed a close and loving relationship with their foster parents. They wanted to be adopted by the

2

foster parents. While the children's preferences were not dispositive, the court found that they underscored the close relationship that the children had with their foster parents. For these reasons, the court found that the first statutory best-interest factor favored termination of mother's rights.

The court also found that the children had adjusted well to their foster home, their school, and their community. They were beginning to thrive and credible testimony from the children's therapists showed that moving the children from this stable and supportive environment was not in their best interests.

As to the most important statutory factor, the court concluded that mother would not be able to resume or assume parental duties within a reasonable period of time. As recounted above, mother struggled to meet basic expectations for housing, counseling, parent education, and visitation over a long period of time. The court recognized that mother faced many challenges, but concluded that her lack of progress was not due to factors beyond her control. Mother had demonstrated that she was capable of engaging and working hard, but she had not done so in the year leading up to termination hearing. While mother indicated that she was now "prepared to do whatever it takes," the court had to balance this claim against the evidence that, deep down, mother still believed that there was no real need for the children's removal in the first place. Much of mother's testimony focused on why DCF was wrong instead of the steps that she would take to restore a healthy and nurturing relationship with the children and meet their needs.

The court explained that it must balance mother's request for more time against the children's overriding need for stability and permanency. There was strong evidence that the children were under a great deal of stress due to the uncertainty about their living arrangements. Given the amount of time that the children had been in custody and the uncertain amount of time that mother would need to be prepared to parent the children, the court concluded that there was little likelihood that mother could resume or assume parental duties within a reasonable period of time.

Finally, the court concluded that while mother loved the children, she had played a destructive role in their lives. She did not ensure that the children attended school. She subjected the children to unsanitary living conditions. There were evictions due to the uninhabitable conditions. There were frequent moves and changes of school. There was violence in the home. Mother allowed her boyfriend to regularly abuse the children. The children were fearful for their physical safety. They suffered trauma for which they were receiving ongoing treatment. Mother had maintained personal contact with the children while they were in custody. She had demonstrated love and affection, but she had not acknowledged the harm she caused. Thus, based on its analysis of the statutory best-interest factors, the court concluded that termination of mother's residual parental rights was in the children's best interests. This appeal followed.

We begin with our standard of review. As we have often repeated, the court must consider four statutory factors in determining if termination of parental rights is in a child's best interests. See 33 V.S.A. § 5114(a)(1)-(4). The most important factor in the court's analysis is the likelihood that the natural parent will be able to resume his or her parental duties within a reasonable period of time. See In re B.M., 165 Vt. 331, 336 (1996). "As long as the court applied the proper standard, we will not disturb its findings [on appeal] unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." In re G.S., 153 Vt. 651, 652 (1990) (mem.). The court applied the appropriate standard in reaching its conclusion here and its decision is supported by the record.

3

Mother does not challenge any of the court's factual findings on appeal, nor does she challenge the court's evaluation of three of the four statutory best-interest factors, including the most important factor. Instead, mother focuses on the court's evaluation of the children's relationships with one another and their relationship with mother. According to mother, the court found that preserving R.-C.M.'s bond with her mother was in R.-C.M.'s best interests, but that this bond must be sacrificed to prevent the children from being separated. Mother asserts that the court's reasoning is flawed because terminating her rights does not ensure that the children will be kept together. Additionally, she argues that the court failed to treat R.-C.M. as an individual and to properly assess her best interests.

We reject the premise of mother's argument. As previously indicated, the statutory factor at issue required the court to evaluate "[t]he interaction and interrelationship of the child with his or her parents, siblings, foster parents, if any, and any other person who may significantly affect the child's best interests." 33 V.S.A. § 5114(a)(1). The court did not find that it was in R.-C.M.'s best interests to maintain her bond with mother. Instead, it found that, relatively speaking, R.-C.M. seemed to have the best relationship with mother as compared to the older children, who had negative and ambivalent relationships with her. The court recognized that the children had a much stronger bond with one another and that the children's best interests were promoted by staying together. In reaching its conclusion, the court plainly considered R.-C.M. as an individual.

Moreover, the court's termination decision with respect to R.-C.M. was the product of a host of considerations, including its conclusions that moving the children from their stable and supportive environment would not be in their best interests, that mother was not likely to be able to assume parental duties within a reasonable period of time, and that, despite her love for the children, mother has played a destructive role in their lives.

We do not agree with mother that the court terminated mother's parental rights with respect to R.-C.M.'s in order to keep the children together, despite its view that maintaining R.-C.M.'s relationship with mother was in the child's best interests. The court reviewed a host of factors common to all three children, as well as individual factors specific to R.-C.M., and concluded that termination was in her best interests, as well as in C.M.'s and R.M.'s best interests.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Beth Robinson, Associate Justice

4