*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2016-361

FEBRUARY TERM, 2017

In re C.R., Juvenile

}  APPEALED FROM:

}
}  Superior Court, Caledonia Unit,
}  Family Division
}
}  DOCKET NO. 84-10-14 Cajv

Trial Judge: Robert R. Bent

In the above-entitled cause, the Clerk will enter:

Mother appeals from the termination of her parental rights in son C.R. She argues that the court failed to accurately assess several of the statutory best-interest factors. We affirm.

C.R. was born in July 2010. Father became C.R.'s custodial parent in 2012, and since that time, mother has had contact with C.R., often while supervised. C.R. was taken into emergency custody of the Department for Children and Families (DCF) in October 2014 after father broke C.R.'s arm while disciplining him. C.R. was later adjudicated as a child in need of care or supervision. In October 2015, DCF moved to terminate both parents' rights. Father voluntarily relinquished his rights, and following a three-day hearing, the court terminated mother's rights.

The court made numerous findings, including the following. While in parents' care, C.R. likely was exposed to substance use, domestic violence and aggression, and he experienced many transitions and disruptions in caregiving. He exhibits signs of a sensitive stress response system which can lead him to tantrum, be hypervigilant, have disrupted sleep, and be emotionally reactive and distressed. He has been diagnosed with posttraumatic stress disorder (PTSD), and is at risk of developmental trauma. C.R. is a challenge to parent due to his aggressive behavior and emotional dysregulation, and he needs consistent and stable adult caregiving. Mother appeared unwilling to gain insight into C.R.'s condition or to accept and work with the family history that led C.R. to his current state.

Mother also exhibits emotional dysregulation. She has been diagnosed with PTSD. She lacks control over her behaviors when triggered and her behavior has not improved over time. The court explained that when C.R. came into DCF custody, mother was living in a shelter and participating in outpatient Subutex treatment. Mother presented a challenge for her case manager because she was reactive, did not hear things clearly, lacked parenting and emotional regulation skills, and lacked the ability to utilize supports. While living at the shelter, mother became pregnant and in May 2015, she went to the Lund Family Center. She was unsatisfactorily discharged from Lund in June 2015 due to her inability to emotionally regulate herself with others. Mother's behavior included swearing, acting in an inappropriate manner, and sexually harassing others in the program. Mother's new child, M.R., was taken into DCF custody upon her birth in July 2015. Since leaving Lund, mother has been residing at a converted motel, an unsuitable home

for raising children. Although mother made progress in addressing her substance abuse, she continued to be easily dysregulated when confronted with opinions with which she disagreed. Mother yelled and cursed during pre- and post-parent-child-contact meetings, and these meetings ended because of her behavior. Although mother's behavior occurred outside the visits, the court found that C.R. likely was aware of them. C.R. told his foster mother that mother "hits people and yells."

Visits between mother and C.R. were suspended in September 2015 after mother made threatening statements to DCF. Visits later resumed, but mother's request in January 2016 to increase visitation was denied in part because of the negative impact that the visits apparently had on C.R. DCF terminated visits in February 2016 based in part on mother's conduct, C.R's emotional struggles, and reports by C.R.'s foster mother of a correlation between visits and C.R. acting out. DCF was also mindful of an expert report that C.R. needed consistent and stable caregivers to overcome his PTSD. Mother resumed contact with C.R. in July 2016, but such contact ceased in August 2016 due in part to C.R.'s reaction to the sole July visit.

Based on these and other findings, the court concluded that mother had stagnated in her ability to parent and that termination of her rights was in C.R.'s best interests. It found that mother failed to comply with the case plan goal of commencing and continuing a progression of Family Time Coaching that would position her to have her own place and be capable of assuming C.R.'s care. The court found that mother lacked the emotional capacity to meet C.R.'s complex needs, even assuming that she could satisfy the housing and self-sufficiency elements of the plan. The court acknowledged that mother made gains in her personal self-care, but concluded that her capacity to parent was compromised by her continued inability to self-regulate, an area of critical importance to C.R. because of his special needs.

The court concluded that all the statutory best-interest factors weighed in favor of termination. As to the most important factor, the court found that mother could not resume parenting C.R. within a reasonable time. As indicated above, despite mother's progress in some areas, her mental health issues had not sufficiently improved for her to safely resume parenting C.R. given his special needs. Additionally, mother lacked sufficient insight into C.R.'s dysfunction to effectively provide what he needed to avoid adverse outcomes. The court found that mother did not play a constructive role in C.R.'s life due to her inability to understand the extent of C.R.'s injury and to provide him with emotional support. It concluded that C.R.'s relationship with mother remained equivocal and emotionally conflicted. Mother could not provide C.R. with the conflict-free zone he required. She had not been able to regulate her conduct with others and it was highly likely that C.R. would witness mother's tantrums with sufficient regularity that he would be harmed. For these and other reasons, the court concluded that termination of mother's rights was in C.R.'s best interests. This appeal followed.

Mother challenges the court's assessment of several statutory best-interest factors. She questions whether the court considered the first statutory best-interest factor—"the interaction and interrelationship of the child with his or her parents"—because the court did not make an explicit finding regarding the "strength and importance" of the mother-child bond. Mother also asserts that the court erred in concluding that she failed to play a constructive role in C.R.'s life due to her "inability to understand the extent of [his] injury and provide him with emotional support." Finally, mother challenges the court's conclusion that her visits were a cause of C.R.'s "state of dysfunction." According to mother, the evidence at best showed a coincidence and not a correlation between visits and C.R's behavioral issues.

As we have often repeated, the court must consider four statutory factors to determine a child's best interests. 33 V.S.A. § 5114. The most important factor is the likelihood that the parent will be able to resume his or her parental duties within a reasonable period of time. See In re B.M., 165 Vt. 331, 336 (1996). As long as the court applied the proper standard, we will not disturb its findings on appeal unless they are clearly erroneous; we will affirm its conclusions if they are supported by the findings. In re G.S., 153 Vt. 651, 652 (1990) (mem.). "Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating mother's parental rights." In re S.B., 174 Vt. 427, 429 (2002) (mem.). We find no abuse of discretion here.

First, it is evident that the court considered mother's relationship with C.R. as required by 33 V.S.A. § 5114. In conducting its analysis, the court was not required to make an express assessment of the "strength and importance" of the parent-child bond. Instead, the statute requires the court to assess "the interaction and interrelationship of the child with his or her parents." Id. § 5114(a). The court determined, based on the findings above, that C.R.'s relationship with mother remained equivocal and emotionally conflicted. The court's conclusion that mother did not play a constructive role in C.R.'s life is equally supported by the evidence. The court explained that while mother would like to provide emotional support to C.R., she lacked the capacity to do so. As set forth above, mother remained unable to regulate her behavior, and she lacked the emotional capacity to meet C.R.'s complex needs. Without a stable and consistent caretaker, the court found that C.R. could not recover from PTSD and he "could easily be tipped into a diagnosis of developmental trauma." Finally, we reject mother's assertion that the court engaged in speculation when it concluded that parent-child contact was causing C.R. stress. The court discussed this issue in considering DCF's decision to stop mother's Family Time visits. It found that DCF had legitimate concerns that the visits were having an adverse effect on C.R., and that DCF had been justified in stopping visits "based on [C.R.'s] state of dysfunction in order to relieve the child's stress." There is evidence to support this finding. C.R.'s foster mother testified that visits with mother were difficult for C.R. and that after discontinuing these visits, C.R.'s mood improved and his anxiety diminished. When the court ordered visits to resume, C.R.'s reactive behavior recommended following the first visit with mother, including attacking his foster mother with a table knife. The court found the foster mother's testimony credible, and it supports the court's findings that there was a relationship between visits and C.R. acting out. We find no grounds to disturb the court's decision.

Affirmed.

BY THE COURT:

_____
Marilyn S. Skoglund, Associate Justice


_____
Beth Robinson, Associate Justice


_____
Harold E. Eaton, Jr., Associate Justice

3