VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.        23-AP-035

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JUNE TERM,   2023

In re L.P., Juvenile
(M.P., Father*)

}
}
}
}
}
}

APPEALED FROM:

Superior Court, Bennington Unit,
Family Division
CASE NO. 20-JV-00482
Trial Judge: Howard A. Kalfus

In the above-entitled cause, the Clerk will enter:

Father appeals from the termination of his rights in daughter L.P.  Mother's rights were also terminated but she did not appeal.  We affirm.

L.P. was born in August 2016.  She was placed in the custody of the Department for Children and Families (DCF) in December 2020 based on an allegation of physical abuse. Following a merits hearing, the court found that father caused an abrasion to L.P.'s lip and adjudicated L.P. as a child in need of care or supervision.  The case plan called for reunification with either parent by February 2022.  Father was directed to refrain from using physical discipline with L.P., learn new parenting strategies, and maintain a safe and stable living environment.  Father initially made progress and L.P. was returned to his care in December 2021 under a conditional custody order (CCO).  Under the terms of the CCO, father was required to refrain from physically disciplining L.P.  The CCO was revoked in March 2022 when L.P. suffered an injury to her eye.  L.P. reported that father punched her, which father denied.  Father was criminally charged for the incident.

In June 2022, DCF moved to terminate father's rights.  Following a hearing, the court granted its request, making findings on the record.  It recounted the procedural history set forth above.  It found that L.P. had not wavered in her assertion that father punched her and she remained fearful that father would engage in further abuse.  After the CCO was revoked, father had limited contact with DCF and no contact with L.P. for approximately eleven weeks.  Father attributed this to a miscommunication from the court.  Even if this were true, the court found, L.P. went from living with father full-time to not seeing him at all for almost three months, which must have been difficult for her.  Father resumed visiting L.P. once a week in the late summer of 2021.  Father was far less engaged during these visits than he had been previously. Rather than progressing to unsupervised visits as he had before, father regressed to the point where the visit supervisor intervened when issues arose and no longer prompted father to engage in alternative parenting techniques.  Father did not progress beyond supervised visitation.  Father was evicted from his apartment in June 2022 and had been living in a tent, with friends, and in a

hotel since that time. At the time of the termination hearing, he was working intermittently and living in a camper with no heat or running water.

The court found that father lacked insight into his failure to make progress in the months following the revocation of the CCO. Father believed that his current housing situation was the only barrier to regaining custody of L.P. More concerning, the court continued, was father's belief that he could obtain housing very quickly with government assistance but he chose not to because he wanted to save sufficient funds to afford rent after the government assistance ended. Even if father was correct about his housing prospects, the court found that he failed to see that the significant delay in reunification was harmful to L.P.

L.P. has significant behavioral issues. She was aggressive with others and exhibited concerning sexualized behavior. She was not fully potty trained and resisted potty-training efforts. She expressed fear of angering father if she had bathroom accidents. DCF was considering more intensive evaluations to understand the causes of her behavior. L.P. had a loving relationship with her foster mother and her foster mother could meet her needs, including her extraordinary behavioral needs. L.P. also had a beneficial relationship with her foster mother's extended family.

Based on these and other findings, the court concluded that father had stagnated in his ability to parent L.P. The court acknowledged father's initial progress. Once the CCO was revoked, however, the court found that his progress stagnated. He did not see L.P. for eleven weeks. He now saw her only once a week for supervised visits at a state office building.[*]

Turning to the statutory best-interest factors, the court found that they all supported termination. As to the most important factor, the court found, based on the facts above, that father could not parent L.P. within a reasonable time as measured from L.P.'s perspective. It explained that father had significant work to do to repair his relationship with L.P., which must be completed before he could parent L.P. on a full-time basis. The court found that L.P. could not wait any longer for father to make progress. While father loved L.P., he did not show her the unconditional love that she needed. The court thus determined that termination of father's rights was in L.P.'s best interests. This appeal followed.

Father argues on appeal that the evidence does not support the court's decision. Father maintains that the progress he made substantially conformed to DCF's expectations. He contends that he can parent L.P. within a reasonable time. According to father, he can quickly find housing and make the changes needed to parent L.P. and he should be given the time to do so. Father asserts that the record shows that he loves L.P. and that she wants to be reunited with him.

When termination is sought after initial disposition through modification of a prior order, the court must first find "that there has been a substantial change in material circumstances" and second, "that termination of parental rights is in the child's best interests." In re K.F., 2004 VT 40, ¶ 8, 176 Vt. 636 (mem.). As long as the court applied the proper standard, we will not disturb its findings on appeal unless they are clearly erroneous; we will affirm its conclusions if they are supported by the findings. In re G.S., 153 Vt. 651, 652 (1990) (mem.).

---

[*] The court also found that mother had no contact with L.P. and made very little progress, if any, with respect to the case plan goals. It found that mother had stagnated in her ability to parent as well.

The court applied the appropriate standard here and its decision is supported by the record. A substantial change in material circumstances is most often found when "the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." In re B.W., 162 Vt. 287, 291 (1994) (citation omitted). "Stagnation may be shown by the passage of time with no improvement in parental capacity to care properly for the child." Id. (quotation omitted). "[T]he mere fact that a parent has shown some progress in some aspects of his or her life," however, "does not preclude a finding of changed circumstances warranting modification of a previous disposition order." Id. (quotation omitted).

The court recognized that father made initial progress in this case. It concluded, however, that his progress stagnated following the revocation of the CCO. Father stopped visiting L.P. for a significant period and he did not progress in his visits with her thereafter. He had regressed in his level of engagement with L.P. He lacked insight into his lack of progress and the way in which his decisions about finding housing affected L.P. While father believes he has not stagnated in his ability to parent, the court concluded otherwise, and its decision is supported by the record. We do not reweigh the evidence on appeal. See In re S.B., 174 Vt. 427, 429 (2002) (mem.) (explaining that Supreme Court's "role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating . . . parental rights").

We similarly find no error in the court's evaluation of the statutory best-interest factors. The court recognized that father loved L.P. but found that he had not demonstrated the type of unconditional love that she needed. Ultimately, it concluded that notwithstanding father's love for L.P., the statutory best-interest factors showed that termination of his rights was in L.P.'s best interests. As to the most important factor, the court found that father could not parent L.P. within a reasonable time. See In re B.M., 165 Vt. 331, 336 (1996) (recognizing that most important statutory factor is likelihood that parent can resume parental duties within reasonable time). That finding is supported by the record. The court cited the various setbacks in father's ability to assume a parenting role for L.P. and the amount of time that would be required to repair his relationship with L.P. While father maintains that he should be given more time to make progress, the court found that L.P. could wait no longer. See In re M.B., 162 Vt. 229, 238 (1994) (recognizing that "[p]ublic policy . . . does not dictate that the parent-child bond be maintained regardless of the cost to the child"). While father disagrees with the result, he fails to show that the court abused its discretion in terminating his parental rights.

Affirmed.

BY THE COURT:

_____
Harold E. Eaton, Jr., Associate Justice

_____
William D. Cohen, Associate Justice

_____
Nancy J. Waples, Associate Justice