VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.      26-AP-050



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JUNE TERM,   2026

In re S.O., Juvenile
(N.B. Mother\* & S.O., Father\*)

}
}
}
}
}
}
}

APPEALED FROM:

Superior Court, Bennington Unit,
Family Division
CASE NO. 24-JV-00507
Trial Judge: Rachel M. Malone

In the above-entitled cause, the Clerk will enter:

Mother and father appeal from the termination of their parental rights in S.O.  We affirm.[*]

S.O. was born in October 2020.  In April 2024, the State filed a petition alleging that S.O. was a child in need of care or supervision (CHINS) and S.O. was placed in the emergency custody of the Department for Children and Families.  At the time of the petition, S.O. was in mother's care and father had not been in contact with S.O. for a significant time.  In October 2024, following a hearing, S.O. was adjudicated as CHINS.  The court found S.O. at risk of harm from accessible drug paraphernalia in mother's home and mother's untreated substance abuse.  Father had not yet been confirmed as S.O.'s parent in October 2024; his parentage was established in December 2024.  In December 2024, the court issued a disposition order and adopted a case plan that continued S.O. in DCF custody and established a permanency goal of reunification with either parent with action steps for each parent.

In April 2025, the State moved to terminate parents' rights.  Following a hearing, the court granted the State's request.  It made the following findings.  Mother had minimal contact with DCF while S.O. was in custody.  She failed to attend meetings and was not responsive to DCF's attempts to reach her.  The only time DCF had consistent contact with mother was while mother was incarcerated in June 2025.  Otherwise, DCF did not know mother's whereabouts.  Mother did not maintain contact with S.O.  She saw him once between August 2024 and February 2026.  Mother did not address concerns about her substance use and she continued to struggle with substance use.  Mother did not complete a mental-health assessment or report any

---

[*] Father's counsel is reminded that a printed case must include page numbers.  See V.R.A.P. 30(d)(1).

engagement in mental-health treatment. She did not participate in parent education. Her living situation was unknown.

The court found that father generally maintained contact with DCF while S.O. was in custody. He had parent-child contact with S.O. for ninety minutes three times per week and the visits generally went well. Father claimed to have a safe and stable residence and DCF tried to discuss moving visits to father's home. Father refused to cooperate, however, and DCF could not approve his residence as a safe place for visitation with S.O. There were also concerns about father's alcohol consumption, including his intoxication while visiting S.O. A screening conducted during a visit showed cocaine and a high presence of alcohol in father's system. Father admitted that he might have been under the influence of alcohol but denied using cocaine. Father did not consider his alcohol consumption an issue and he had not engaged in a substance-use assessment or any treatment by the time of the court's termination order.

The court found it unclear where father was living and whether there were other individuals living with him. Father had refused to allow DCF to visit his residence. Father reported that there were various individuals in and out of his apartment, including his brother who was recently released from jail. Father ultimately provided DCF with his address, but he refused to provide any additional information or otherwise cooperate with attempts to move visits with S.O. to his home. Father expressed that he did not want DCF in his home.

At the time of the court's order, S.O. had been in his current foster placement for over a year. He had a close and loving relationship with his foster parent and his foster parent was meeting all of his needs.

Based on these and other findings, the court first found that there had been a material change in circumstances since the disposition order as neither parent made meaningful progress toward addressing the concerns that were present when S.O. was placed in DCF custody. As recounted above, mother had minimal contact with DCF and essentially no contact with S.O. She had not addressed her substance use or shown that she achieved any level of safety and stability in her life. Father consistently engaged in visits with S.O. and made progress in developing his parenting skills, but he failed to engage in a substance-use assessment, despite repeated instances of appearing intoxicated during his visits with S.O. The court noted that the case plan expectation was for father to abstain entirely from alcohol and, given father's conduct, a substance-use assessment was a reasonable request. Father also refused to work cooperatively with DCF to discuss his living situation. This constituted a significant impediment toward reunification and meant that father failed to make real progress toward caring for S.O. independently. While father testified at the termination hearing that he had changed his mind about cooperating with DCF, the court was not certain it could take him at his word. Even if father did fully cooperate and allow a home visit and provide information about any other residents in his home, the court had no way to know as of the date of its order if father's housing was safe and appropriate and if not, how long it would take to become safe and appropriate. The court found father entirely responsible for this situation. He had not progressed in his parenting of S.O. beyond supervised visits three times per week and he had refused over the course of several months to take the steps that would allow him to play a larger role in caring for S.O.

Turning to the statutory best-interest factors, the court found that they weighed in favor of terminating parents' rights. The court noted that while mother at one time may have had a close and loving relationship with S.O., she had no current relationship with him given her failure to visit S.O. while he was in DCF custody. Father was generally an engaged parent, and

he had developed a close and loving relationship with S.O. But their interactions did not progress beyond ninety-minute visits three days per week. Father had never cared for S.O. beyond these limited interactions. S.O.'s primary relationship was with his foster parent, and he was doing well in his foster mother's care. Parents could not independently care for S.O. Finally, the court found that mother did not play a constructive role in S.O.'s life once he came into DCF custody. Father had played a constructive role and continued to do so, but his role was limited as a result of his own actions. The court thus concluded that termination of both parents' rights was in S.O.'s best interests. Both parents appealed.

To modify an existing disposition order, the trial court must first find that there has been a substantial change in material circumstances, and second, that termination of parental rights is in a child's best interests. In re B.W., 162 Vt. 287, 291 (1994); see 33 V.S.A. §§ 5113, 5114. A substantial change in material circumstances is most often found when "the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." In re B.W., 162 Vt. at 291 (quotation omitted). The best-interest factors are set forth in 33 V.S.A. § 5114, and the most important factor is the likelihood that the natural parent can resume his or her parental duties within a reasonable time. In re B.M., 165 Vt. 331, 336 (1996). "As long as the court applied the proper standard, we will not disturb its findings [on appeal] unless they are clearly erroneous[;] we will affirm its conclusions if they are supported by the findings." In re G.S., 153 Vt. 651, 652 (1990) (mem.).

Mother argues that the court erred in finding that she played no role in S.O.'s life. She notes that she was S.O.'s primary caregiver until he was placed in DCF custody and contends that the court should have given this fact greater weight in evaluating the best-interest factors. Mother also asserts that because she parented S.O. in the past, there was a strong likelihood that she could do so again.

Mother misreads the court's order. The court expressly recognized that mother had been S.O.'s primary caregiver during the first four years of his life and likely had a close and loving relationship with him during that time. It emphasized, however, that mother had no present relationship with S.O. as she had seen him only once in over a year. The court was clear that mother played no role in S.O.'s life after he was placed in DCF custody. The court's findings with respect to its best-interest evaluation are supported by the evidence, and we do not reweigh the evidence on appeal. See In re S.B., 174 Vt. 427, 429 (2002) (mem.) ("Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating mother's parental rights . . . ."). Mother similarly fails to show that the court erred in finding that she could not parent S.O. within a reasonable time. As set forth above, the court found that mother made no progress in addressing the case-plan goals while S.O. was in DCF custody. She did not address her substance-abuse issues or demonstrate an ability to provide S.O. with a safe home. Again, the court's findings are supported by the record, and they support the court's conclusion. While mother may disagree with the court's conclusion, she fails to demonstrate any error.

We thus turn to father's arguments. Father asserts that the court erred in finding that he stagnated in his ability to parent because the court found that he played a constructive role in S.O.'s life. Because he played a constructive role, father argues that the termination of his rights was not in S.O.'s best interests. According to father, the court should not have given great weight to his failure to provide DCF with information about his housing situation and his failure to make progress in independently caring for S.O. He maintains that his failure to cooperate on

this point should have no bearing on his relationship with S.O. or his ability to parent S.O., particularly given that the issue was swiftly resolved at the termination hearing.

As an initial matter, issues surrounding father's housing situation were not resolved at the termination hearing. To the contrary, the court expressly found that even assuming that father had truly changed his mind about cooperating with DCF, it had no way to know if his housing was safe or, if not, how long it would take to become so. The court found father responsible for this situation, not DCF as father suggested. Father's remaining arguments war with the trial court's assessment of the weight of the evidence. The court's decision with respect to father is amply supported by its findings, which in turn support the court's conclusions. As set forth above, the court found that father stagnated because he failed to make real progress toward caring for S.O. independently, and it concluded that the statutory factors showed that termination of father's rights was in S.O.'s best interests. While father may disagree with the court's decision, he fails to show any abuse of discretion. See, e.g., Meyncke v. Meyncke, 2009 VT 84, ¶ 15, 186 Vt. 571 (mem.) (explaining that arguments which amount to nothing more than disagreement with court's reasoning and conclusion do not make out case for abuse of discretion).

Affirmed.

BY THE COURT:


Nancy J. Waples, Associate Justice


Christina E. Nolan, Associate Justice


Michael P. Drescher, Associate Justice

4