*Note:  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

**ENTRY ORDER**

SUPREME COURT DOCKET NO. 2015-344

JANUARY TERM, 2016

In re L.C., Juvenile | } | APPEALED FROM:
| } |
| } | Superior Court, Chittenden Unit,
| } | Family Division
| } |
| } | DOCKET NO. 76-3-13 Cnjv

Trial Judge: Thomas J. Devine

In the above-entitled cause, the Clerk will enter:

Father appeals from the termination of his parental rights in daughter L.C.[*]  He argues that the evidence does not support the court's conclusions that he stagnated in his ability to parent and that termination of his rights was in L.C.'s best interests.  We affirm.

L.C. was born in December 2005.  In March 2013, she was taken into emergency custody of the Department for Children and Families (DCF).  Parents later stipulated that L.C. was a child in need of care or supervision.  After about three months in foster care, L.C. was placed in her maternal grandmother's care, where she remains.  In September 2014, DCF moved to terminate father's rights.  Following a hearing, the court granted its request.

The court found as follows.  Parents were involved in a long-term on-and-off-again relationship.  Mother was L.C.'s primary care provider, and father has never been L.C.'s custodial parent for any extended period of time.  Parents engaged in explosively loud and angry confrontations throughout L.C.'s childhood.  Mother was physically aggressive, and the police were summoned on numerous occasions.  The ongoing exposure to conflict was traumatic for L.C.  Mother also appears to have mental health issues, and there were periods of time in which mother would become hyper-sexualized.  It was unclear if L.C. was exposed to sexual activity in the home, but L.C. has since manifested sexualized behaviors and exhibited a high degree of interest and anxiety about sexual topics.

During the parties' relationship, mother abruptly left with L.C. several times, once moving from Maine to New Hampshire, and then to San Francisco.  Father did not know where mother and L.C. had gone until mother called and said they were staying at a shelter.  Father then joined them in San Francisco, but mother later left again, taking L.C. in the family van to Oregon, where they again stayed in a shelter. Eventually, the parties returned to Maine.  In 2010, mother moved to Vermont with L.C.  Father was absent from L.C.'s life for about two years thereafter.  During this time, mother and L.C. came to DCF's attention on a number of occasions. In December 2012, father relocated to Vermont, and parents again became embroiled in conflict.

---

[*] Mother voluntarily relinquished her rights.

L.C. began struggling academically and behaviorally. Parents resisted having L.C. evaluated for special educational services, and she was subsequently placed in DCF custody.

DCF initially sought reunification with mother or father, but later changed its plan to include a concurrent goal of adoption by grandmother. The case plan recommended, among other things, that father continue in individual counseling and have regular parent/child contact with L.C. under a family time coaching model. Although father consistently attended visits during L.C.'s first year in custody, L.C.'s interactions with father were largely on a surface level, and L.C. did not "push limits." Father was resistant and argumentative with the family time coach, and exhibited challenging behavior at shared parent meetings as well. While the family time coach found father easier to work with after the first year, L.C. had also begun to "push limits," and her behaviors had intensified. Father consistently struggled to read L.C.'s cues, and L.C. in turn became frustrated. Father also had a tendency to speak to L.C. in a long-winded and pedantic way. Despite the family time coach's assistance, father did not make progress in this area. L.C. has consistently stated to others that she does not want to visit with father, and she has told father that she does not want to live with him.

The court found that father had been secretive and guarded in his interactions with DCF. While father insisted to DCF that his relationship with mother was over, for example, he was allowing mother to stay in his home overnight. Father also did not provide DCF with a release form to allow it to confirm his participation in therapy until mid-February 2014. The court found that father's lack of candor with the social workers had impeded case planning and delayed measures which were being designed to implement reunification.

While in custody, L.C. continued to exhibit challenging behaviors at school and in her foster placement, including verbal and physical aggressiveness as well as sexualized behaviors. Her behavior worsened as she began having expanded visits with parents. A trauma assessment concluded that L.C. was likely exposed to trauma from a variety of sources, including extreme parental conflict, multiple moves, possible parental mental illness, and exposure to police intervention at her home. The report recommended that L.C. have a treatment team to oversee a host of therapeutic interventions. Dr. Sharon Lamb conducted a family forensic evaluation, and the court gave her assessment great weight. Dr. Lamb determined that L.C.'s attachment to her parents was "disorganized" and had been negatively impacted by her unstable upbringing. She saw signs that L.C. had significant attachment to her grandmother, and that grandmother was a source of comfort and stability to L.C. L.C. was clear that she did not want to live with her father. Dr. Lamb did not observe signs of attachment between L.C. and father, although there were times L.C. showed spontaneous affection for father. Dr. Lamb concluded that father did not have the ability to take on a child with L.C.'s special needs, and she was specifically concerned that father would put his own need for closeness over L.C.'s needs.

Consistent with Dr. Lamb's additional testimony, the court found that L.C. has an overwhelming need for stability and consistency in her life given the upheaval she experienced prior to coming into DCF custody. She needed a caregiver who was reliable and predictable. The court also credited Dr. Lamb's conclusion that father had cognitive distortions that directly impacted his parenting ability; he was unable to appreciate the significance of L.C.'s own separate psychological and behavioral challenges and address those needs. The court found Dr. Lamb's conclusion supported by other evidence in the record as well. Although father had housing and employment, the court found that he was not ready to assume full-time caretaking

responsibilities for L.C. then, or at any point in the foreseeable future, given L.C.'s extensive special emotional needs, father's minimization of those needs, and his absence over many years.

Turning to L.C.'s relationship with grandmother, the court found that grandmother had been a source of support and stability for L.C. Grandmother had ensured that L.C. attended appointments with her treatment providers, and she had worked closely with L.C.'s therapist to learn about L.C.'s needs. L.C. and grandmother had a close and loving bond, and grandmother has been able to put L.C.'s needs ahead of other priorities. Grandmother was willing to adopt L.C.

Based on these and numerous other findings, the court first concluded that father had stagnated in his ability to parent. The court recognized that, since the disposition order, father had engaged in many of the identified services in the disposition plan. He had attended visitation regularly using a family time coach. He participated in individual therapy, and his therapist confirmed father had made some good progress. There was also evidence that father was now less secretive and guarded in his interactions with DCF. Father had also recently ended his relationship with mother. Despite superficial progress, however, the court concluded that father's core ability to meet L.C.'s needs remained in doubt. The family time coach noted that father still struggled to read L.C.'s cues; it took months of redirection before father could change certain behaviors during visitation; and he continued to show a lack of sensitivity to L.C.'s anxiety about sexuality. When L.C. arrived at one visit in crisis, father was unable to respond effectively and seemed unaware that she was in crisis. The court reiterated that father maintained unrealistic expectations about his ability to meet L.C.'s needs and work with her service providers. They noted that father had never provided sustained daily care of L.C. He has not attended team meetings or worked with her special education team. At the height of L.C.'s explosive behaviors in school, at a time when even her one-on-one aide could not restrain her, father was lobbying for L.C. to attend traditional religious instruction classes. The court emphasized that father continued to show a lack of insight into L.C.'s condition. L.C. had been in DCF custody for almost two-and-a-half years during which time there had not been substantial progress, such that there was a substantial change in material circumstances.

The court next considered if termination of father's parental rights was in L.C.'s best interests. It found that father loved L.C., and on a certain level, L.C. enjoyed portions of her time with father. Her relationship was conflicted, however, and she did not display signs of attachment to father. L.C. did not turn to father for comfort, care and solace, and she had been steadfast in her desire not to live with father. By contrast, L.C. was strongly attached to grandmother, and they had a close and loving relationship. Her needs for a reliable and consistent caretaker were met in this relationship.

The court rejected father's contention that placement with grandmother had not gone well, finding that this argument underscored father's lack of insight into the nature of L.C.'s special needs. While father had many good attributes, the court concluded that the length of time required for him to learn about L.C.'s needs, engage with her service providers, demonstrate competency in reading her cues, and learn sensitivity in managing her behavior needs, remained profoundly unclear. It found that L.C. had an overriding need for stability and permanency, and given the amount of time that had already passed and the uncertain amount of time that father required, there was little likelihood that father could assume parental duties within a reasonable period of time. Finally, the court found that father loved L.C., and cared deeply for her well-being. At the same time, however, he and mother had exposed L.C. to conflict, instability, and

turmoil. After a two-year absence, father's re-entry into L.C.'s life had been a source of great challenge for her, during a time when she had also been adapting to other significant changes in her living situation. Thus, considering the statutory best-interest factors, the court concluded that termination of father's rights was in L.C.'s best interests. This appeal followed.

Father first argues that the court erred in finding stagnation, citing the progress that he made in addressing the case plan goals. In a similar vein, he asserts that the court erred in assessing L.C.'s best interests. He points to the court's findings that he loves L.C., and that on a certain level, L.C. enjoys time with him. He cites other positive findings as well, and asserts that he is ready to resume parenting L.C.

When the termination of parental rights is sought, the trial court must conduct a two-step analysis. In re B.W., 162 Vt. 287, 291 (1994). The court must first find that there has been a substantial change in material circumstances; second, the court must consider if termination of parental rights is in a child's best interests. Id. To determine the best interests of the child, the court must consider four statutory factors. See 33 V.S.A. § 5114. The most important factor in the court's analysis is the likelihood that the natural parent will be able to resume his or her parental duties within a reasonable period of time. See In re B.M., 165 Vt. 331, 336 (1996). As long as the court applied the proper standard, we will not disturb its findings on appeal unless they are clearly erroneous; we will affirm its conclusions if they are supported by the findings. In re G.S., 153 Vt. 651, 652 (1990) (mem.).

We find no error here. With respect to stagnation, we have recognized that the mere fact that there has been some progress in some aspects of a parent's life "does not preclude a finding of changed circumstances warranting modification of the disposition order." See In re A.F., 160 Vt. 175, 181 (1993). In a similar vein, we have emphasized that the DCF case plan "is not intended to be a mere checklist the parent must satisfy to ensure the automatic return of [a child] to the parent's care." In re D.M. & T.P., 2004 VT 41, ¶ 7, 176 Vt. 639, 640 (mem.). In this case, the court recognized the positive factors identified by father. It acknowledged that father had engaged in many of the services identified in the disposition plan. Notwithstanding this superficial progress however, the court concluded that father's core ability to meet L.C.'s needs remained in doubt. The court's findings, set forth above, support this conclusion, and its findings are supported by the evidence. While father argues that the court should have reached a different conclusion, it is for the trial court, not this Court, to assess the credibility of witnesses and weigh the evidence. In re S.B., 174 Vt. 427, 429 (2002) (mem.). We will not reweigh the evidence on appeal.

We reach a similar conclusion as to the court's assessment of L.C.'s best interests. As with his first argument, father simply challenges the trial court's assessment of the weight of the evidence. Again, the trial court recognized the positive factors cited by father. It nonetheless concluded that the statutory best-interest factors supported termination. As reflected above, the court found, among other things, that father had never served as L.C.'s primary custodial parent for any extended time period; he exposed L.C. to conflict, instability, and turmoil during her childhood and then was absent for several years; he needed prompting and direction to help L.C. during visits; he had an unrealistically optimistic view of his abilities to provide care for a child whose needs remained complex; L.C. had an overriding need for stability and permanency, and these needs were satisfied in her relationship with grandmother. The court made numerous additional findings, which we need not reiterate here. The findings are supported by the record,

4

and they support the court's conclusion that termination of father's rights was in L.C.'s best interests.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
John A. Dooley, Associate Justice

_____
Beth Robinson, Associate Justice